Mark E. HANSON, Appellant,

v.

Edward J. DERWINSKI, Secretary
of Veterans Affairs, Appellee.

No. 90–675.

United States Court of Veterans Appeals.

Argued June 21, 1991.

Decided Oct. 16, 1991.

Rick Surratt (non-attorney practitioner) for appellant.

Michael R. Smalls, with whom Raoul L. Carroll, Gen. Counsel, Barry M. Tapp, Asst. Gen. Counsel, and Andrew J. Mullen, Deputy Asst. Gen. Counsel, were on the brief, for appellee.

Before FARLEY, IVERS and STEINBERG, Associate Judges.

FARLEY, Associate Judge:

Appellant is seeking compensation for Tourette's syndrome and a psychiatric disorder (paranoid schizophrenia). With respect to the claim for Tourette's syndrome, the only conclusion that can be drawn from the record is that appellant's Tourette's syndrome was present during service. Therefore, we hold pursuant to 38 U.S.C. § 7261(a)(4) that the Board of Veterans' Appeals (Board or BVA) was clearly erroneous in its conclusion that appellant's Tourette's syndrome "is not shown to have been present during service and was first manifested several years thereafter." With respect to appellant's claim for a psychiatric disorder (paranoid schizophrenia), we find that the Board's adjudication was flawed as a matter of law. Accordingly, the BVA decision of March 23, 1990, is reversed and the matter remanded pursuant to 38 U.S.C. § 7252(a). On remand the Secretary is directed to (1) grant service connection for appellant's Tourette's syndrome and to take the appropriate steps to ensure that he receives a prompt rating consistent with this opinion, and (2) promptly readjudicate appellant's psychiatric disorder claim in a manner consistent with this opinion.

## I.

### Background

Appellant, Mark E. Hanson, served on active duty in the United States Army from April 1976 to January 1980. R. at 30. Neither his report of medical history nor his enlistment medical examination contain any finding of a psychiatric disorder. R. at 8–11. On October 29, 1979, over three years after entering service, the veteran went to the medical clinic complaining of a "mental problem." He was seen by a "PV2" who noted that: "Pt c/o being hyperactive, nervous, being under tension." R. at 17. He returned two days later, on October 31, 1979, and was seen by a Private First Class corpsman who noted that the veteran complained of "nervousness, tension, hyperactive, nausea, faint." R. at 18. A "mental hygiene consult" was scheduled for November 1, 1979, *id.*, on a

referral "by his unit for inability to cope with demands of military." R. at 21. The record does not reflect the basis for the referral although appellant has testified that during this same period of time, he attempted to commit suicide. R. at 89.

Notes signed by JoKay Adams, counselor, "for Sheridan Tucker, Captain, MSC, [sic] Psychiatrist," document visits by the veteran to the Outpatient Psychiatry Service on November 1, 13, and 21, 1979. R. at 19. The note dated November 1, 1979, indicates that the patient was evaluated by Dr. Tucker who prescribed Haldol. R. at 19. The medication was changed to Stelazine on November 13, 1979, and refilled on November 21, 1979. *Id.* The psychiatric out-patient/clinical psychology service statement which is dated November 5, 1979, but appears to pertain to the consultation on November 1, 1979, contains a series of check-off blocks. The check in block 5 under recommendations indicates that: "The individual be separated from the military ..." with the diagnosis of: "Inadequate Personality DSM II–301.82." R. at 20. Dr. Tucker, a psychiatrist, signed the statement, but it is prepared in language which indicates that it was written by JoKay Adams, who also signed. The diagnostic impressions were:

a. Inadequate personality, DSM II–301–82

b. This assessment, while not indicating any major pathology, does reveal characteristics of an inadequate personality. Manifestations of this inadequacy are:

(1) Suicidal and homicidal ideations.

(2) Very poor stress tolerance.

(3) Poor general adjustment to the military.

R. at 21. It was also noted that appellant's "rehabilitative status [was] poor." *Id.* "[T]he service member [was] psychiatrically cleared for any administrative action deemed appropriate by command" and it was recommended that there be "expeditious separation of the service member from the military." *Id.*

On December 4, 1979, the veteran was given a physical examination by the Physical Exam Section at Fort Polk, Louisiana.

The purpose of the examination was listed as "200 chapter 13." R. at 22. (Chapter 13 of Army Regulation 635–200 governs separations for unsuitability.) As part of his separation examination, the veteran submitted a "Report of Medical History." R. at 24–25. In block 8, which asked for "medications currently used," the veteran indicated that he was presently taking Haldol and Stelazine, which is consistent with the prescriptions. R. at 24. The veteran indicated in the blocks 9 "have you ever" and in block 11 "have you ever had or have you now" 33 possible conditions. *Id.* Of particular significance are positive notations under the following conditions: Attempted suicide; Stutter or stammer habitually; Dizziness [underscored on the original form] or fainting spells; Epilepsy or fits; Depression or excessive worry; Loss of memory or amnesia; Nervous trouble of any sort; Periods of unconsciousness. *Id.* On the second page of the "Report of Medical History," the veteran indicated in response to the block 21 question: "Have you consulted or been treated by clinics, physicians ... within the past five years ... ?": "Doctor Tucker, hospital Ft. Polk. Clinic mental." R. at 25. In response to block 23 "Have you ever been discharged from military service because of physical, mental, or other reasons?", the veteran responded "Yes right know [sic] Dec. 4 79 personality changes Chap 13 honorable." *Id.*

The results of the medical examination are recorded on a "Report of Medical Examination." R. at 22–23. On the second page of the report, block 76 contains a physical profile which is divided into six categories (P, U, L, H, E, S). The "P" stands for "physical capacity or stamina"; the "U" stands for "upper extremities"; the "L" stands for "lower extremities"; the "H" stands for "hearing and ear"; the "E" stands for "eyes"; and the "S" stands for "Psychiatric. This factor concerns personality, emotional stability, and psychiatric diseases." 9–3(b)(1)–(6) Army Regulation 40–501, Change 35 (Feb. 9, 1987). The number "1" appears in each of the six categories. R. at 23. "An individual having a numerical designation of '1' under all factors is considered to possess a high level

of medical fitness and, consequently is medically fit for any military assignment." 9–3(c)(1) Army Regulation 40–501, Change 35. Thus, the examining physician, Captain Chaffin Goodloe, M.D., gave appellant a physical profile, with a psychiatric dimension, which indicates that he was medically fit for duty. Dr. Goodloe checked block 77 expressing his conclusion that the appellant was "qualified for separation" and signed the form. *Id.*

Dr. Goodloe also performed a mental status examination on December 4, 1979. R. at 26. The pre-printed form is headed "Mental Status Examination" and notes that it is from the "Physical Exam Service" (to be distinguished from the psychiatry service). *Id.* Dr. Goodloe's notations indicate that the veteran was normal in behavior, fully oriented, his thinking process was clear, his thought content normal, his memory fair and his probable effectiveness of further rehabilitation only fair. His level of alertness was "dull" and his mood was "depressed". *Id.* The form has pre-typed on it the statement: "Impression: No significant mental illness." *Id.* The veteran was discharged from the service at Fort Polk, Louisiana, on January 8, 1980. R. at 30.

Appellant was admitted to a Department of Veterans Affairs (VA) Medical Center on August 28, 1984, where he was diagnosed as suffering from: "1. Alcohol dependence, continuous. 2. Gilles de la Tourette syndrome. 3. Schizotypcal [sic] personality disorder, probable." R. at 27. On November 16, 1984, appellant filed a reopened VA claim for Tourette's syndrome and nervousness. R. at 34. (The record on appeal does not contain the prior claim(s) or rating decision(s).) On December 6, 1985, appellant's claim was denied by the rating board. R. at 34.

The record contains medical records dating from 1985 which show treatment for Tourette's syndrome. R. at 37–67. During this time appellant was taking the medication Haldol. A psychological evaluation was performed on appellant and a report prepared on February 24, 1986. R. at 68–71. Appellant testified in a personal hear-

ing before the rating board that the onset of his problems occurred while stationed in Germany in 1978–1979. R. at 86–87. On July 15, 1986, appellant's claim was again denied by the rating board. R. at 102. The BVA issued a decision denying appellant's claim on October 10, 1986. R. at 122–26.

Appellant again reopened his claim on July 19, 1988. R. at 135. In November 1988, a letter was submitted from Sergeant First Class William S. Scott, an individual who served with appellant in the service and who was then still in the service. Sergeant Scott provided a description of appellant's behavior during his service in the military.

> The most obvious and observable symptom was that he was evidently incapable of controlling what came out of his mouth. He was speaking literally every moment and if what he was saying was planned, it was generally punctuated with strong obscenities. If it was not a part of a coherent thought, then what he said consisted entirely of obscenities. I do not mean to say that Mark merely used bad language, which is unfortunately common among soldiers. I mean to say that the words he used were often entirely out of context from the thought he was attempting to express, or even unrelated to any expression of thought at all....
>
> Besides the verbal aspect of Mark's difficulties, there were others. He suffered near spastic twitching of his hands and arms. He stuttered badly and skipped uncontrollably as he walked. He also emitted a high-pitched giggle with no apparent control over time or place....
>
> In closing, I feel it is important ot [sic] stress that my recollections of Mark Hanson are in no way exaggerated. If anything I have failed to convey just how serious his condition was.

R. at 138–39. Appellant's claim was denied by a rating decision on January 5, 1989 (the decision bears the date of 1988 but it is clear from the context that it was 1989). R. at 144.

On July 20, 1989, a letter was submitted on behalf of appellant from Jan Campbell, M.D., a VA staff psychiatrist at the VA Medical Center, Kansas City, Missouri, who has treated appellant since 1984. R. at 153–54. Dr. Campbell stated:

> In my opinion, from the records and his history, Mr. Hanson had the onset of Tourette's and paranoid schizophrenia while in the Army in 1977....
>
> ... [There has been a] gradual evolution of symptoms over several years. His previous diagnosis of personality disorder should be seen as the prodrome for paranoid schizophrenia.

R. at 154. Dr. Campbell, after reviewing Sergeant Scott's letter, stated: "The condition described by Mr. Scott is unequivocally Tourette's Disease, with virtually classical symptoms." R. at 153. Dr. Campbell admitted to not having seen the military medical records which diagnosed appellant as having a personality disorder. *Id.*

On August 25, 1989, the appellant's claim was denied. R. at 156. Appellant appealed to the Board which denied his appeal on March 23, 1990. *Mark E. Hanson*, BVA 90–01738 (Mar. 23, 1990). The BVA concluded that while the veteran had submitted new and material evidence, including the letters from Sergeant Scott and Dr. Campbell, the new evidence "does not overcome the preponderant weight of the contemporaneous medical records which show no findings of an acquired psychiatric disorder or Tourette's syndrome during service or within one year thereafter." R. at 6. The Board held that "an acquired psychiatric disorder was [not] present during service ..." and that "Tourette's syndrome [was] not shown to have been present during service and was first manifested several years thereafter." *Hanson*, BVA 90–01738, at 6.

On July 20, 1990, appellant filed a timely appeal with this Court. Oral argument was held on June 21, 1991.

## II.

Service connection is to be granted to a veteran who served "in the active military, naval, or air service, during other

than a period of war" and developed a "disability resulting from personal injury suffered or disease contracted in line of duty, or ... aggravat[ed] ... a preexisting injury suffered or disease contracted in line of duty." 38 U.S.C. § 1131 (formerly § 331). "Service connection may be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service." 38 C.F.R. § 3.303(d) (1990).

■ In reviewing a finding of fact made by the Board, the Court will "hold unlawful and set aside such finding if the finding is clearly erroneous." 38 U.S.C. § 7261(a)(4); *Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990). The "clearly erroneous" standard has been defined as follows: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *see also Gilbert*, 1 Vet.App. at 52. In determining whether a finding is clearly erroneous, "this Court is not permitted to substitute its judgment for that of the BVA on issues of material fact; if there is a 'plausible' basis in the record for the factual determinations of the BVA ... we cannot overturn them." *Id.*, at 53.

### A.

On this record, with respect to the onset of appellant's Tourette's syndrome, this Court is left with the "definite and firm conviction that a mistake has been committed." *United States Gypsum Co.*, 333 U.S. at 395, 68 S.Ct. at 542. Although the Board found that the new evidence submitted on behalf of the veteran "does not overcome the preponderant weight of the contemporaneous medical records," *Hanson*, BVA 90–01738, at 6, we find that those contemporaneous records contain nothing which contradicts the new evidence. There is no " 'plausible' basis in the record" for the Board's conclusion that appellant's Tourette's syndrome "is not

shown to have been present during service and was first manifested several years thereafter," *Id.* at 6; in effect and in fact, all of the evidence of record in this case indicates that appellant's Tourette's syndrome was incurred in service.

Dr. Campbell, a VA psychiatrist, who has treated appellant for several years, expressly stated the Tourette's syndrome began in service. This opinion, which is based upon the history relayed by the veteran and the corroborating statement from Sergeant Scott, is the only expert medical opinion of record. There is nothing of probative value in the record which refutes Dr. Campbell's opinion that "[t]he condition described by Mr. Scott is unequivocally Tourette's Disease, with virtually classical symptoms." R. at 153.

■ In choosing not to credit Dr. Campbell's opinion, the Board chose to rely on the absence of an in-service diagnosis and noted that Dr. Campbell did not have access to the military records. However, the fact that a condition was not diagnosed cannot, by itself, serve to rebut a subsequent expert diagnosis. That is particularly true when, as is the case here, the record documents that the veteran was under medication at the time of the original diagnosis. Moreover, the records which were not available to Dr. Campbell actually buttress rather than rebut his conclusion. The symptoms contemporaneously described by the veteran during the separation physical, particularly the positive notations of habitual stutter or stammer, dizziness or fainting spells, epilepsy or fits, loss of memory or amnesia, and periods of unconsciousness, appear to support Dr. Campbell's conclusion; they certainly do not undercut it.

In *Willis v. Derwinski*, 1 Vet.App. 66 (1991), the Court approved of the use of a medical expert to offer an opinion as to whether a veteran's current disability had its origins in the service. *See also Caldwell v. Derwinski*, 1 Vet.App. 466, 470 (1991). Moreover, the Court has held that "the conclusion of an examining psychiatrist is a medical conclusion, one which the BVA is not free to ignore or disregard." *Willis*, 1 Vet.App. at 70 (citing *Murphy v.*

*Derwinski,* 1 Vet.App. 78, 81 (1990)); *see also Caldwell,* 1 Vet.App. at 470. "Nor may the Board substitute its own medical judgment." *Willis,* 1 Vet.App. at 70 (citing *Colvin v. Derwinski,* 1 Vet.App. 171, 175 (1991)) (Board cannot provide its own medical judgment; rather, it must consider only independent medical evidence); *see also Meister v. Derwinski,* 1 Vet.App. 472, 473 (1991); *Caldwell,* 1 Vet.App. at 470. In adjudicating claims "the BVA is always free to supplement the record by seeking an advisory opinion, ordering a medical examination" or quoting recognized medical authority. *Colvin,* 1 Vet.App. at 175. In this case, the VA could have secured an additional medical expert to review the records and offer an opinion as to the origins of appellant's disabilities. Indeed, the regulations require the BVA to remand to the Regional Office (RO) for further development where the BVA finds the record inadequate. 38 C.F.R. § 19.182(a); *see also Littke v. Derwinski,* 1 Vet.App. 90, 93 (1990). Here the BVA chose not to do so.

Pursuant to 38 C.F.R. § 3.303(d) (1990), "[s]ervice connection may be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service." Dr. Campbell's post-discharge diagnosis both stands unrebutted and supported by the evidence of record. Therefore, "all of the evidence ... establishes that the [Tourette's syndrome] was incurred in service." 38 C.F.R. § 3.303(d). We therefore hold pursuant to 38 U.S.C. § 7261(a)(4) that the Board was clearly erroneous in concluding in its decision of March 23, 1990, that appellant's Tourette's syndrome "is not shown to have been present during service and was first manifested several years thereafter." *Hanson,* BVA 90–01738, at 6. Accordingly, the BVA decision with respect to the Tourette's syndrome claim must be reversed.

### B.

In addition to opining that the appellant's Tourette's syndrome began in service, Dr. Campbell also concluded that the in-service diagnosis of personality disorder was wrong and that the appellant's current psychiatric condition (paranoid schizophrenia) had its onset while he was in the service. He specifically stated:

> In my opinion, from the records and his history, Mr. Hanson had the onset of ... paranoid schizophrenia while in the Army in 1977....
>
> ... [There has been a] gradual evolution of symptoms over several years. His previous diagnosis of personality disorder should be seen as the prodrome for paranoid schizophrenia.

R. at 154. The Board again disagreed with Dr. Campbell, ruling that his opinion was outweighed by the neuropsychiatric examination in December 1979 which "indicated that the veteran was fully oriented with normal behavior and thought content. There was no psychiatric diagnosis and a neurologic examination was entirely normal." R. at 6.

■ The defects in the Board's decision with respect to the claim for service connection for a psychiatric disorder are numerous. From a statutory perspective, the Board applied the wrong standard in reopening and adjudicating the claim for service connection for the psychiatric disorder under 38 U.S.C. § 5108 (formerly § 3008). Under the standard announced in *Manio v. Derwinski,* 1 Vet.App. 140, 145–146 (1991), the Board is first required to determine whether the evidence submitted is new and material. If the Board determines that the evidence is new and material then it is required to reopen the claim and reevaluate all of the evidence, both the new evidence and all of the other previously submitted evidence. It is obvious from the discussion and evaluation section that the Board did consider the statements from Dr. Campbell and Sergeant Scott and other material to be new and material evidence, a conclusion with which we agree, but it did not reopen and redetermine the entire evidence of record.

■ From a medical perspective, the report of the December 1979 separation examination presents a weak reed upon which to rely in rejecting the opinion of Dr. Camp-

bell, particularly in the absence of a detailed statement of the reasons or bases which is required by 38 U.S.C. § 7104(d)(1) ("Each decision of the Board shall include ... a written statement of the Board's findings and conclusions, and the reasons or bases for those findings and conclusions, on all material issues of fact and law presented on the record...."); *Gilbert*, 1 Vet.App. at 56–58. In the first place, the veteran was under medication at the time of the examination. *See* R. at 24. Second, the mental examination does not appear to have been conducted by a mental health professional. Third, the report contains numerous potential internal inconsistencies which were never addressed, much less resolved, by the Board. For example, there is the apparent inconsistency between Dr. Tucker's inservice observations of suicidal and homicidal ideations on the one hand and his diagnosis of only a personality problem on the other. That is particularly poignant in view of Dr. Campbell's later opinion that the symptoms of the present psychiatric condition actually existed during service. In addition, appellant's separation examination report indicates that he had a physical profile, including the psychiatric dimension, which rendered him medically fit for duty. The same examination report indicated that appellant was "qualified for separation." Fourth, if the Board is going to make a medical conclusion that suicidal and homicidal behavior is a symptom of a personality disorder rather than a psychotic condition, medical support will have to be provided under *Murphy v. Derwinski*, 1 Vet.App. 78, 81 (1990) (Board decisions must include reasons or bases for medical conclusions). *See also Colvin*, 1 Vet.App. at 175.

Finally, we note that there are gaps in the medical records. Appellant is fairly consistent in his testimony that there were at least two "nervous breakdowns" and one suicide attempt while he was in the military. Yet, there is no record of any such incidents or resulting treatment. In addition, veteran's representative, in the hearing before the Regional Office in 1986, specifically asked that copies of the VA Fayetteville, Arkansas Medical Center records be retrieved (R. at 93–94). That request does not appear to have been honored because no such records are referenced in the BVA decision or included in the record on appeal. Pursuant to 38 U.S.C. § 5107 (formerly § 3007), the Secretary has a statutory duty to assist VA claimants in "developing the facts pertinent to the claim." *Murphy*, 1 Vet.App. at 82; *Jolley v. Derwinski*, 1 Vet.App. 37, 39–40 (1990); *Littke*, 1 Vet.App. at 92–93. The duty to assist includes securing "relevant VA, military, and governmental records." *Murphy*, 1 Vet.App. at 82; *see also Jolley*, 1 Vet.App. at 39–40.

Based upon the foregoing, the Court concludes that a remand is necessary to permit the Board to readjudicate the claim for service connection for paranoid schizophrenia and to support its findings and conclusions by a statement of reasons or bases pursuant to 38 U.S.C. § 7104(d)(1). On remand, the Board should seek to acquire any additional records which would enable it to make a completely informed decision, one supported by the requisite statement of reasons or bases.

### III.

With respect to the claim for Tourette's syndrome, we hold that pursuant to 38 U.S.C. § 7261(a)(4) the Board was clearly erroneous in its conclusion that appellant's Tourette's syndrome "is not shown to have been present during service and was first manifested several years thereafter." *Hanson*, BVA 90–01738, at 6. The only plausible conclusion that can be drawn from all of the evidence of record is that appellant's Tourette's syndrome was present during service. With respect to appellant's claim for a psychiatric disorder (paranoid schizophrenia), we find as a matter of law that the Board's adjudication was flawed. The Board chose to credit the in-service diagnosis of personality disorder and to reject the post-service diagnosis of paranoid schizophrenia without articulating the reasons or bases for its choice and without addressing and resolving the inconsistencies in the record which undermine its conclusions. Accordingly, the BVA deci-

sion of March 23, 1990, is reversed and the matter remanded pursuant to 38 U.S.C. § 7252(a). On remand the Secretary is directed to (1) grant service connection for appellant's Tourette's syndrome and to take the appropriate steps to ensure that he receives a prompt rating consistent with this opinion, and (2) promptly readjudicate appellant's psychiatric disorder claim in a manner consistent with this opinion.

*It is so Ordered.*