**Freddy J. ODIORNE, Appellant,**

v.

**Anthony J. PRINCIPI, Acting Secretary of Veterans Affairs, Appellee.**

No. 90–583.

United States Court of Veterans Appeals.

Nov. 13, 1992.

Max P. Flusche, Jr., Austin, Tex., was on the brief, for appellant.

Raoul L. Carroll, Gen. Counsel, Barry M. Tapp, Asst. Gen. Counsel, Andrew J. Mullen, Deputy Asst. Gen. Counsel, and R. Randall Campbell, Washington, D.C., were on the brief, for appellee.

Before NEBEKER, Chief Judge, and IVERS and STEINBERG, Associate Judges.

IVERS, Associate Judge:

Appellant, Freddy J. Odiorne, appeals from a March 14, 1990, Board of Veterans' Appeals (BVA or Board) decision which denied service-connection for appellant's left-knee condition. The Board found that appellant's left-knee condition existed prior to service and was not aggravated by service. The Board also found that appellant was not permanently and totally disabled within the meaning of the law and regulations governing non-service-connected pension benefits. Upon review, we hold that, in denying appellant's claim, the BVA failed to consider several applicable statutes and regulations and failed to comply with the requirement of 38 U.S.C. § 7104(d) (formerly § 4004(d)) that its decision provide an adequate statement of reasons or bases for its findings and conclusions. *See Smith v. Derwinski*, 2 Vet.App. 137, 141 (1992); *Willis v. Derwinski*, 1 Vet.App. 63, 66 (1990); *Gilbert v. Derwinski*, 1 Vet.App. 49, 59 (1990). Therefore, for the reasons set forth below, the Board's decision is affirmed as to the left-knee condition but vacated as to the pension claim and the case is remanded to the Board for further adjudication. The Court also vacates the Board's erroneous finding of fact that appellant's arthritis of the left knee was not present during service.

## I. BACKGROUND

Appellant served in the United States Army from March 24, 1954, to January 30, 1956. R. at 12. Prior to service, while attending college, appellant injured his left knee while playing football in November 1953. R. at 16. Apparently, he was struck on the lateral side of his left knee by another player. R. at 17, 40. According to appellant, he informed the preinduction examining physician, Captain I.A. Ceips, Medical Corps (MC), that he had a prior injury to his left knee. R. at 86, 96. However, the record is silent as to whether appellant was experiencing problems with his left knee at the time of induction and Captain Ceips made no notation of a left-knee injury on the "Report of Medical Examination." R. at 13–14. In fact, Captain Ceips marked "normal" for "lower extremities" which included "strength, range of motion." R. at 13. On the second page of the medical report, block 76 contains a physical profile which is divided into six categories (P, U, L, H, E, S). The "P" stands for "physical capacity or stamina"; the "U" stands for "upper extremities"; the "L" stands for "lower extremities"; the "H" stands for "hearing and ear"; the "E" stands for "eyes"; and the "S" stands for "psychiatric." Para. 9–3(b)(1)–(6), Army Regulation (AR) 40–501, Change 35 (Feb. 9, 1987). *See also Hanson v. Derwinski*, 1 Vet.App. 512, 514 (1991). "L" or "lower extremities" includes "the feet, legs, pelvic girdle, lower back musculature, and the lower spine (lower lumbar and sacral) in regard to strength, range of motion, and general efficiency." Para. 9–3(b)(1)(3), AR 40–501, Change 35. The number "1" appears in each of the six categories. R. at 14. "An individual having a numerical designation of '1' under all factors is considered to possess a high level of medical fitness and, consequently is medically fit for any military assignment." Para. 9–3(c)(1) AR 40–501, Change 35. Captain Ceips gave appellant a physical profile indicating that appellant was "qualified for service" and signed the form. R. at 14.

It was not until almost six months later, August 26, 1954, that appellant sought medical attention because of pain in his left

knee. R. at 15. He was given a light duty slip. *Id.* On September 13, 1954, appellant sought treatment again and was diagnosed with an unstable knee and prescribed physical therapy to strengthen it. R. at 17. Appellant's prior left-knee injury was noted on the clinical record, but no entry was made regarding a causal relationship between the prior injury and appellant's present injury. R. at 16. On September 29, 1954, appellant's condition was found to be "improving with quadriceps exercises." R. at 20. There was a notation that he "hurt [his] knee again yesterday," but x-rays were negative and no change was found in his condition. He was instructed to continue his exercises. *Id.* Appellant participated in physical therapy until he was discharged from care because he failed to appear for his appointment on November 12, 1954. R. at 16.

In December 1954, while home on leave, appellant "jumped up to catch a pass [and] when he came down [his] left knee buckled." R. at 19. Appellant sought treatment when he returned to base. X-rays were taken but were negative. He was diagnosed as having a "[p]ainful infrapatellar front pad left knee," but no treatment or medication was entered. *Id.* On February 23, 1955, an Army physician diagnosed chondromalacia of appellant's left patella. R. at 20. Chondromalacia patellae is defined as "the premature degeneration of the patellar cartilage, the patellar margins are tender so that pain is produced when the patella is pressed against the femur." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 326 (27th ed. 1988). Again appellant's condition was not linked to his prior injury. Appellant was given a temporary "L 3" profile requiring no knee bending, prolonged marching, or running athletics for three months. The limitation was to expire automatically on May 23, 1955. R. at 32.

After May 23, 1955, appellant continued to have problems with his left knee and on June 17, 1955, appellant requested to see an orthopedic doctor about his knee. The treating physician noted that appellant "complain[ed] of [a] painful knee after playing ball etc. [He] has mod[erate] chondromalacia of [the] patella on left [knee]."

R. at 28. Appellant was advised to stop using his knee, but it was noted that appellant "prefers to continue playing ball." *Id.* Appellant was not scheduled for an orthopedic examination. Later, on June 29, 1955, appellant again requested an examination by an orthopedic physician but was again refused, apparently on the grounds that appellant had "ignored medical advice" not to play any sports. R. at 29. Appellant was assigned an "L 3, Code G" profile and told not to participate in sports. *Id.* Although given a "Code G" profile, the physician probably intended a "Code C" profile. "Code G" profiles deal with the upper extremities, and "Code C" profiles concern the lower extremities. *See* Para. 9–3(c)(3), AR 40–501, Change 25.

On August 2, 1955, appellant underwent an orthopedic examination and was again diagnosed as having chondromalacia patella, left knee. R. at 27. On August 3, 1955, he was given a temporary "L 3, Code C" profile that ended on September 7, 1955. R. at 26. Under this profile, he was not to do deep knee bends, crawling, running, marching, walking, or standing over an hour. He was also not to participate in any sports. *Id.* The record is silent from August 1955 until appellant's discharge examination on December 27, 1955. Appellant was examined by First Lieutenant Weiner, MC. Although First Lieutenant Weiner marked "normal" for appellant's "lower extremities," he did assign a "3" under "L" for appellant's physical profile. R. at 35. Although appellant's earlier profiles were considered temporary, he was still considered disabled for purposes of his discharge examination.

From May 28, 1956, to May 31, 1956, appellant was hospitalized at the Little Rock, Arkansas, Veterans' Administration (now Department of Veterans Affairs) (VA) Hospital for his left-knee pain. R. at 40–41. Appellant was diagnosed with a tear of the medial collateral ligaments in his left knee. The medical collateral ligament is defined as "a ligament that connects the medial epicondyle of the femur with the medial condyle and medial surface of the tibia and that helps to stabilize the

knee by preventing lateral dislocation." WEBSTER'S MEDICAL DESK DICTIONARY 416 (1986). He was instructed to eliminate heavy activity, such as sports, for three to six months. If trouble developed over this period, he was to be readmitted for a repair of the medial collateral ligaments. R. at 40.

In October 1956, appellant applied to the VA for compensation or pension. R. at 36–39. Along with his application, appellant submitted letters from Sam Hindsman, Head of the Physical Education Department of Arkansas Technology, and his father, attesting to his left-knee condition. R. at 42, 44. The rating board denied service connection for appellant's left-knee disorder in a rating decision, dated December 6, 1956. R. at 45.

On June 11, 1957, appellant attempted to reopen his claim for disability benefits regarding his left knee. R. at 47. From May 29, 1957, to July 16, 1957, appellant had received treatment for his left knee. R. at 51–52. Appellant was diagnosed by Dr. N.J. Bublis, Chief, Orthopedic Service at the VA Medical Center at Temple, Texas, as having "osteoarthritis, probably of post-traumatic origin." R. at 51. On May 31, 1957, a ruptured medial meniscus was removed from the left-knee joint, followed by therapy, at the conclusion of which appellant was "essentially asymptomatic." *Id.* The rating board characterized appellant's claim as one for a non-service-connected pension and denied it in an August 22, 1957, rating decision. R. at 53.

Appellant did not attempt to reopen his claim until September 7, 1976, when he again filed an application for compensation or pension. R. at 55–58. By letter of October 20, 1976, the VA Regional Office informed appellant that in order to reopen his prior claim for service connection, he had to provide new and material evidence. R. at 59. Appellant sent a letter to the VA requesting an examination, R. at 61–62, but the record is silent as to whether an examination took place.

Appellant again attempted to reopen his claim on August 16, 1988, R. at 62–65. He requested examination by a VA physician and submitted a letter, dated March 5, 1974, from Dr. J. Keith Pevey, which stated that appellant may need a total knee joint replacement in the future. R. at 65–66. According to his report of medical examination for disability evaluation, he received treatment from Dr. Pevey from 1974 to 1981, Dr. Harmon from 1984 to 1987, and Dr. Abell in 1988. R. at 75. He also received treatment from Dr. Joe Rhoades in 1986. An injection was given but no evaluation was made. R. at 73. A radiology report, dated December 11, 1984, showed that x-rays were taken of both of appellant's knees and "degenerative changes with joint space narrowing and hypertrophic spurring" were found, as well as "some loose bodies in the joint." R. at 68. Another x-ray taken on November 16, 1988, revealed "[m]oderately severe degenerative osteoarthritis of the right knee" and "[s]evere degenerative osteoarthritis of the left knee." R. at 80. Appellant underwent a VA examination in November 1988. He was diagnosed as having a "[l]eft knee injury with [a] ruptured medial meniscus, traumatic arthritis, postoperative, severe, with 20% loss of flexion in the left knee" and "arthritis of the right knee with loss of flexion of 10 degrees." R. at 82.

On January 10, 1989, the rating board denied appellant's claim for service connection for his left-knee condition, finding no new or material evidence. The rating board also determined that he did not meet the schedular requirements for non-service-connected pension benefits, based upon his education and age. R. at 83. Appellant filed a Notice of Disagreement on April 20, 1989. R. at 86. On March 14, 1990, the BVA conducted a de novo review of appellant's claim and upheld the denial of service connection, and the denial of non-service-connected pension. *Freddy J. Odiorne,* BVA 90–11724 (Mar. 14, 1990). Appellant made a timely appeal to this Court. The Court has jurisdiction to hear this appeal pursuant to 38 U.S.C. § 7252 (formerly § 4052).

## II.  ANALYSIS

### A.  Service–Connected Compensation

■ The Court finds that the evidence submitted by appellant to reopen his claim

for service connection for a left-knee disorder was not "new and material" evidence as defined in *Colvin*, and, therefore, that claim should not have been reopened. Both Dr. Pevey's statement and the November 1988 VA examination dealt with appellant's current left- and right-knee conditions. There is not a "reasonable possibility" that either piece of evidence, "when viewed in the context of all the evidence, both new and old, would change the outcome." *Colvin v. Derwinski*, 1 Vet.App. 171, 174 (1991). Although the Board erred by failing to apply the proper test for reopening claims, its error was harmless. *See* 38 U.S.C. § 7261(b) (formerly § 4061); *Kehoskie v. Derwinski*, 2 Vet.App. 31, 34 (1991); *Godwin v. Derwinski*, 1 Vet.App. 419, 425 (1991); *Thompson v. Derwinski*, 1 Vet.App. 251, 254 (1991).

■ Although appellant was seeking service connection for his left-knee disorder, appellant also raised a "new" claim when he attempted to reopen his claim. In addition to his reopened claim for service connection of his left-knee disorder, appellant also made a claim for service connection for arthritis in both knees. Since these claims were not addressed by either the rating board or the BVA, they are remanded for adjudication. *See Douglas v. Derwinski*, 2 Vet.App. 435, 439 (1992), *citing EF v. Derwinski*, 1 Vet.App. 324, 326 (1991) (Board is not limited to those issues specifically mentioned on appellant's VA Form 1–9 appeal). With regard to the claim for arthritis, at least as to the left knee, the Court holds that the Board's Finding of Fact No. 3 that "[a]rthritis of the left knee was not shown in service, at separation, or for more than 15 years following final service separation," *Odiorne*, BVA 90–11724, at 10, is clearly erroneous, given the 1957 diagnosis of "traumatic arthritis, left knee joint." R. at 8. If the Board determines that appellant's arthritis is service-connected, then he should be evaluated for individual unemployability under 38 C.F.R. § 4.16.

### B. Non–Service–Connected Pension

■ To establish entitlement to a non-service-connected pension, appellant must meet the requirements of 38 U.S.C. § 1521(a) (formerly § 521(a)) that a veteran serve during a period of war and be permanently and totally disabled. *See Talley v. Derwinski*, 2 Vet.App. 282, 284–86 (1992); *Hyder v. Derwinski*, 1 Vet.App. 221, 223 (1991); *Ferraro v. Derwinski*, 1 Vet.App. 326, 333 (1991). Appellant's service, from March 24, 1954, to January 30, 1956, falls partially within the Korean conflict era which began on June 27, 1950, and ended on January 31, 1955. *See* 38 U.S.C. § 101(9). Thus, the remaining question is whether he "is permanently and totally disabled." In making this determination, the Board must comply with the requirement of 38 U.S.C. § 7104(d) by providing an adequate statement of reasons or bases for its findings and conclusions. *See Gilbert*, 1 Vet.App. at 57. Because the Court finds the Board's discussion to be lacking adequate reasons or bases for its decision on the pension claim, the decision on that issue is vacated and remanded.

In the its discussion regarding the veteran's pension claim, the Board stated:

The veteran's disabilities include his right and left knee disabilities. A thorough review of the medical evidence of record shows that these disabilities do not prevent him from engaging in work commensurate with his age, skills, and generally adequate state of health. While they are productive of some limitation of function and effectiveness, he exhibits no incapacitating manifestations which would preclude all forms of substantially gainful employment. While the veteran may have been found to be disabled by the Department of Health and Human Services, the Board observes that the award of VA benefits is governed by different laws and regulations and any VA benefit award must be made under the laws and regulations set forth herein. Accordingly, it is the judgment of the Board that there is no reasonable basis for allowance of a permanent and total disability rating for pension purposes.

*Odiorne*, BVA 90–11724, at 9. The Board, although concluding that appellant is not

precluded from all forms of substantially gainful employment, failed to give reasons or bases for its determination. Although the Board stated that appellant's "unemployed status does not establish that he is unemployable, since lack of employment may result from a variety of causes, not consistent with unemployability," it is appellant's contention that the sole cause of his current unemployment and his inability to find any new employment is his left-knee disability. In his "Statement in Support of Claim," he mentioned that the pain in his knee

> is severe enough that it has caused [him] problems in finding a job. I have been unemployed since 1986; and can find no employer who will hire me, master's degree included. I have applied through city, county, [and] state agencies, has [sic] no hiring offers from any of them. I cannot stand [one] minute without severe pain—that's why I had to quit coaching in 1985.

R. at 87. The Board must address appellant's allegations and discuss why it finds appellant employable. *See* 38 C.F.R. § 4.17 (1991).

 In evaluating appellant's pension claim, the Board must also give more attention to the decision of the Department of Health and Human Services (Social Security). Although the Social Security decision regarding appellant's unemployability is not controlling for purposes of a final VA determination, it is relevant to the present claim. *See Collier v. Derwinski*, 1 Vet. App. 413, 417 (1991); *Murincsak v. Derwinski*, 2 Vet.App. 363, 370 (1992). The evidence is relevant to the determination of appellant's ability to secure and follow a substantially gainful occupation under 38 C.F.R. § 4.17. As we stated in *Collier:*

> [T]he BVA cannot ignore or disregard relevant evidence in the record. *See Webster v. Derwinski*, 1 Vet.App. 155, 159 (1991). If it discredits evidence, the BVA must give adequate reasons or bases for doing so. *See Sammarco v. Derwinski*, 1 Vet.App. 111, 112 (1991); *Gilbert v. Derwinski*, 1 Vet.App. 49, 56–57 (1990) (quoting *International Longshoremen's Assoc. v. National Media-*

*tion Board*, 870 F.2d 733, 735 (D.C.Cir. 1989)).

*Collier*, 1 Vet.App. at 416. In evaluating employability claims, debilitating pain should also be considered pursuant to 38 C.F.R. § 4.59 (1991). *See Hatlestad v. Derwinski*, 1 Vet.App. 164, 169–70 (1991); *Martin v. Derwinski*, 1 Vet.App. 411, 413 (1991). Here neither the rating board nor the BVA addressed appellant's pain in its evaluations.

### III. CONCLUSION

For the reasons stated above, the decision of the BVA is AFFIRMED as to appellant's left-knee condition but VACATED as to the Board's erroneous finding of fact that appellant's left-knee arthritis was not present until 15 years after service and as to appellant's pension claim, and those matters are REMANDED for proceedings consistent with this opinion.