ZN, Appellant,

v.

Jesse BROWN, Secretary of Veterans Affairs, Appellee.

No. 93–493.

United States Court of Veterans Appeals.

Feb. 4, 1994.

Philip J. Fornaci, Washington, DC, was on the brief, for appellant.

Mary Lou Keener, Gen. Counsel, Norman G. Cooper, Asst. Gen. Counsel, David W. Engel, Deputy Asst. Gen. Counsel, and Adam K. Llewellyn, Washington, DC, were on the brief, for appellee.

Before FARLEY, MANKIN, and STEINBERG, Judges.

STEINBERG, Judge, filed the opinion of the Court in which FARLEY, Judge, joined.

MANKIN, Judge, filed a concurring opinion.

STEINBERG, Judge:

The appellant veteran (ZN) appeals a May 11, 1993, Board of Veterans' Appeals (BVA or Board) decision denying entitlement to service connection for acquired immune deficiency syndrome (AIDS). R. at 7–16. On May 14, 1993, the appellant timely filed his Notice of Appeal, and on May 21, 1993, he filed correspondence in which he asked the Court for extraordinary relief in the form of expedited consideration of his appeal, the basis for his request being his deteriorating health. The Court construed the appellant's correspondence as a motion for expedited consideration pursuant to Rule 47 of this Court's Rules of Practice and Procedure, and on May 28, 1993, the Court ordered expedited consideration in this appeal. Pursuant to Rules 11(c)(2) and 48, the Court, sua sponte, on May 28, 1993, sealed the record of this appeal and assigned the appellant an encoded identifier, "ZN". *See* U.S.Vet.App.R. 11(c)(2), 48; 38 U.S.C. § 7268(b)(1). The appellant, through counsel, filed his brief on

November 8, 1993; the Secretary filed his brief on December 3, 1993; and the appellant filed a reply brief on December 10, 1993. For the reasons that follow, the Court will vacate the Board's decision and remand the matter for readjudication consistent with this opinion.

## I. Background

The veteran served on active duty in the United States Navy from November 1980 to November 1983. R. at 19. The reports of his November 1980 enlistment and December 1980 recruit screening examinations revealed no pertinent abnormalities. R. at 21–30. According to service medical records (SMRs), on December 9, 1980, he complained of having suffered, over the prior 24 hours, dizziness with nausea and vomiting. R. at 31. A physical examination revealed "slight serous otitis" in both ears, and the examiner diagnosed "viral syndrome [with] serous otitis". *Ibid.* On December 13, 1980, the veteran complained of having had a sore throat and fever for two days. R. at 32. A physical examination revealed a temperature of 104 degrees; the examiner described the veteran's lungs as congested and his throat as red and inflamed and noted "frontal tenderness". A culture test for beta streptococcus was positive (R. at 34), and the examiner assessed strep throat ("inflammatory sore throat caused by hemolytic streptococci", WEBSTER'S MEDICAL DESK DICTIONARY 648, 680 (1986) [hereinafter WEBSTER'S]) and herpes simplex II (infection marked by eruption of lesions on the genitalia, STEDMAN'S MEDICAL DICTIONARY 709 (25th ed. 1990) [hereinafter STEDMAN'S]). R. at 31. On December 18, 1980, the veteran underwent a medical examination in connection with submarine duty; the only pertinent abnormality found was "eustachian tube dysfunction". R. at 35–39.

On January 28, 1981, the veteran reported to sick call complaining of a nosebleed. R. at 42. The examiner made an assessment of "URI" (upper respiratory infection). *Ibid.* On February 19, 1981, the veteran reported to sick call complaining of "cold symptoms"; the examiner's assessment was of a URI. R. at 43. According to a March 4, 1981, SMR entry, the veteran's URI and eustachian tube dysfunction prevented him from completing pressure-and-escape training; the examiner opined that those conditions would be present for 180 days. R. at 46.

According to an April 28, 1981, SMR entry, the veteran complained of having experienced two episodes of nausea and vomiting and two episodes of diarrhea that morning. R. at 47. Physical examination revealed "generalized tenderness" but no swelling or masses, and the examiner made an assessment of gastroenteritis. R. at 47. An August 1981 SMR entry noted that the veteran was physically qualified for messman duty. R. at 48. A December 2, 1981, physical examination noted a temperature of 99.8 degrees and "no complaints except groin rash". R. at 50. An SMR entry dated December 7, 1981, stated a diagnostic impression of URI, noting complaints of, inter alia, runny nose, nausea, headache of three days' duration, and a groin rash of two weeks' duration; the examiner noted no lymphadenopathy (any disease process affecting a lymph node, STEDMAN'S, at 900). R. at 51. On December 29, 1981, when the veteran sought treatment for his groin rash, the examiner noted an "ongoing h[istory] of scaling erythematous lesions to groin and nodular lesions to inner aspects [of the upper] thighs" and assessed tinea cruris ("jock itch", STEDMAN'S, at 1603) and folliculitis (inflammatory reaction in hair follicles, STEDMAN'S, at 603). R. at 56.

In September 1982, the veteran was examined following complaints of headache and blurred vision, but an optometric examination revealed "no apparent cause". R. at 58. That same month, he was examined after complaining of a two-week history of vomiting and diarrhea. R. at 59–60. The examiner noted a "long h[istory] of same s[ymptoms] throughout childhood" and made a diagnosis of gastritis. R. at 60.

In April 1983, the veteran complained of a sore jaw. R. at 61–62. On June 2, 1983, he was examined following a complaint of abdominal cramps; the examiner assessed gastritis. R. at 63. An assessment of gastritis was made again on June 3, 1983, after the veteran had complained of diarrhea of four days' duration, vomiting, and abdominal

cramps. R. at 64. On July 12, 1983, he was diagnosed with "anxiety r[eactio]n" after having reported lightheadedness and two episodes of hyperventilation. R. at 66–67. A psychological consultation performed at that time described him as "[m]oderately anxious and tearful" and stated that he had complained of "difficulty eating, concentrating, [and] sleeping [and] loss of energy". R. at 70. The examiner stated that the veteran was seeking a "humanitarian transfer/discharge due to needing to help [his] blind mother" and diagnosed "[a]djustment [disorder] with mixed emotional features". R. at 70–71. The report of the veteran's 1983 separation examination was negative for any relevant abnormality. R. at 72–73.

In December 1991, the veteran was hospitalized at a Department of Veterans Affairs (VA) (formerly Veterans' Administration) Medical Center (MC). A nursing entry dated December 11, 1991, stated:

> [The veteran] is a . . . homosexual admitted . . . yesterday [with] depressed mood/adjustment disorder. He reports that he was found to be HIV [positive] 8/91. He also states that [a] biopsy of a lesion on his r[ight] shoulder was found to be Kaposi's sarcoma. . . . His male lover of 11 years died of AIDS in 7/91."

R. at 99. ("HIV" or "human immunodeficiency virus", also known as "HTLV–III", is "a retrovirus implicated as the agent causing the underlying immunodeficiency in AIDS", WEBSTER'S, at 304; Kaposi's sarcoma is a disease characterized by formation of tumorous plaques, associated with immunodeficient individuals with AIDS, WEBSTER'S, at 361). On a nursing intake form, under the heading "Any High Risk Exposure", an examiner indicated a positive response for "Homo[sexual]/Bisexual Activity" and negative responses for "Shared needles", "Recent Blood Transfusion", "Prostitution", "Sexual promiscuity", and "Recent Tattoos". R. at 95. A mental health clinic entry noted: "He has smoked marijuana in the past. No other substance/alcohol abuse." R. at 92. A December 11, 1991, entry stated "No AIDS[-]defining infection to date." R. at 98. A separate nursing entry from that date stated, inter alia: "He states he and his lover

have not been completely monogamous." R. at 101.

In January 1992, the veteran filed with a VA regional office (RO) an application for compensation or pension, listing his disability as AIDS and stating: "I cont[r]acted the virus after 1981. I began showing symptoms in 1982[:] night sweats, swollen lymph nod[e]s, [and] d[iarrhe]a." R. at 84. He stated that he had received "lymphatic system" treatment in 1982 while in the Navy and in July 1984 at a private hospital; he also provided the names and addresses of three individuals who, he stated, had knowledge of his having had "HIV infection" in 1982 and 1983. R. at 84–85.

The record contains a January 1992 letter to the veteran from Dan McEachern, an HIV counselor at the Nashville, Tennessee, Metro Health Department, stating:

> [Y]ou [inquired] about when testing began for the Human Immunodeficiency Virus. Testing for antibodies (previously referred to as HTLV III) began in the spring of 1985.
>
> The Red Cross began testing in April or May, 1985 and we started offering the test here at the health department around June 1, 1985.
>
> If a person was diagnosed prior to that time, it was done on the basis of physical symptoms without the confirmation of infection with the [v]irus.

R. at 179.

The record contains a January 1992 letter from Dr. L.A. Warner, Jr., a private physician, who wrote:

> I performed an appendectomy on this patient in 1974 and have seem him for various and sundry complaints since that time. . . . He was going to school at Memphis State in the summer of 1984 and came to my office requesting that I obtain a certain pharmaceutical that he and another student required in an experiment. At that particular time he discussed his concern about his having night sweats, being extremely tired and weak, and loss of energy. He had lymph nodes in the neck, axilla, and inguinal area that were palpable. He feared that he may have AIDS

but did not want to have a blood test for this at that time because of the confidentiality, etc. I have not seen this patient since 1984; but he called today stating that he does have AIDS and that he feels that this disease has been present since our consultation in 1984. This history is entirely plausible and believable; and I for one endorse it.

R. at 182. In February 1992, the RO requested that Dr. Warner provide copies of any treatment notes. R. at 185. In a letter dated later that month, Dr. Warner restated the information contained in his January 1992 letter, adding: "The [veteran] knew [in May 1984] that he had AIDS symptoms and was very upset. I asked a pastor friend ... to counsel with him.... [The veteran] was very upset with his probable diagnosis of AIDS." R. at 187. Dr. Warner provided treatment records, dated February 1974 to October 1978, indicating treatment for, inter alia, gastritis and gastroenteritis in February 1974 and again in March 1977; nausea in February 1978; and "mid abd[ominal] pain" of two weeks' duration in September 1978. R. at 189–93.

In March 1992, the veteran underwent a "systemic conditions" examination, conducted by Dr. Mary Alice Harbison, at the Nashville VAMC. The examination report stated, under the heading "medical history": "Homosexual with frequent contacts in New York in early [19]80's while stationed in Connecticut. States that he noted the onset of night sweats and cervical adenopathy [swelling of lymph glands of the neck, STEDMAN'S, at 26, 280] in 1982 and has letter document[ ]ing concern about HIV since 1984." R. at 195. Dr. Harbison diagnosed "advanced HIV/AIDS with probable Kaposi[']s sarcoma, AIDS dementia", and made the following comments:

[The veteran's] history and examination are entirely compatible with long-standing HIV infection acquired during his military service. Current level of immune deficiency and low T4 count [level of thyroxine, an iodine-containing hormone, WEBSTER'S, at 718] certainly bespeak longstanding infection, and I have no doubt that he did acquire it in New York City (an area of extremely high risk) during the stated time period; he gives accurate history of developing night sweats and lymph node swelling at that time which is consistent with new seroconversion ["change of a serologic test from negative to positive, indicating the development of antibodies in response to infection or immunization", DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1510 (27th ed. 1988) [hereinafter DORLAND'S]] and I concur with Dr. Warner's assessment that he was infected with HIV at that time.

R. at 196, 204.

In a March 1992 decision, the RO denied service connection for AIDS. R. at 206–07. The decision stated:

On our special VA examination, even though the examining physician commented that the veteran's history and examination are entirely compatible with long standing HIV infection acquired during his military service, it is our opinion that the objective medical evidence of record indicates still that the veteran was first diagnosed with a positive blood test in August, 1991, and not during service.

... There currently is no presumptive period for AIDS and so considering all of this together, we feel that it would be medically speculative at this time to grant service-connection for AIDS at this time [sic].

R. at 207.

In April 1992, the veteran (through counsel) filed a Notice of Disagreement with the RO's decision. R. at 211. That same month, the RO received a letter from a service member who had been a shipmate of the veteran from March 1981 to June 1983. That service member stated: "During our time of duty [the veteran] confided in me on several occasions. I recall that he told me he had symptoms of HIV. He also was concerned about the Navy finding out about his illness." R. at 224–25. In April 1992, the RO issued a confirmed rating decision. R. at 227. That same month, the veteran, alluding to "the uncertainty associated with" his disease, asked that the BVA expedite his appeal. R. at 229. In an April 1992 written submission to the Board, the veteran's representative

argued that the March 1992 VA examination and Dr. Warner's statements "left no doubt" but that the veteran had become infected with HIV during service. R. at 237.

The veteran subsequently submitted to VA a March 1992 letter from the Office of the General Counsel of the U.S. Department of Health and Human Services. The letter transmitted a one-page excerpt, apparently from a medical journal, stating, inter alia, that "[i]n 1985, the first enzyme immunoassay ... for detection of human immunodeficiency virus type 1 (HIV–1) antibody was licensed by the Food and Drug Administration". R. at 244–45. The veteran also submitted an October 1987 newsletter published by VA and titled "From the Administrator", which stated, inter alia, that AIDS "was first reported in the United States in mid–1981" and noted, under the heading "Early Role of VA": "One of the first cases of 'epidemic' Kaposi's sarcoma was diagnosed at the New York VAMC in 1979." R. at 255.

In a written presentation submitted to the Board on June 9, 1992, the appellant's representative asserted that "[d]irect service connection for AIDS is warranted; ... symptoms compatible with AIDS were complained of, and in fact treated, during the veteran's military service." R. at 262. The representative cited to a medical treatise (CURRENT MEDICAL DIAGNOSIS AND TREATMENT (30th ed. 1991)) to support the proposition that "many individuals with HIV infection remain asymptomatic for years[, t]he mean being 10 years between exposure and development of AIDS." R. at 263.

In a June 19, 1992, decision, the BVA remanded the matter to the RO with the following instructions, among others:

1. The RO should contact the service department for verification of any post-active duty reserve service, as well as to obtain medical records for any such service, including the results of HTLV–III or HIV testing, if performed.

. . . . .

3. The veteran should also be requested to clarify whether he was seen by any other physicians during or since service, and after appropriate consent from the veteran, the RO should obtain legible copies of all such clinical records.

. . . . .

5. The RO should contact [Dr. Warner] to clarify the basis for two recent statements regarding a date in May 1984 when the veteran and an associate reportedly visited the physician.... [Dr. Warner] should be also requested to clarify what tests were specifically contemplated when the veteran was then seen, and other circumstances of the visit.

R. at 266–69.

In June 1992, the RO received a letter, dated April 1992, from Dr. Gary Swinger, an epidemiologist with the Tennessee AIDS Program. R. at 280–81. Dr. Swinger stated that he was a lieutenant colonel in the U.S. Air Force Reserves and further stated:

I am ... quite familiar with the lack of documentation of HIV/AIDS[-]related signs, symptoms[,] and risk factors in military health records due to real or perceived discriminatory actions in the military and the lack of confidentiality surrounding the issues.... My confidential interviews of active[-]duty personnel at risk for HIV infection ... often ha[ve] revealed quite discordant histories to those in military records, especially during the early and mid 1980's before more tolerant policies were adopted by the military.

R. at 280. Dr. Swinger indicated that he had interviewed the veteran and had "reviewed his medical records for the periods prior to, during, and since his period of active service in the [Navy]", and stated:

I strongly agree with the assessments of Dr. L.A. Warner and Dr. Mary A. Harbison that [the veteran] became infected with [HIV] during 1982 while stationed near New York City.

During the 1981–1983 time period HIV transmission was at its peak among male homosexuals in the New York City area; and in fact that was the time and place where the highest rates of sexual transmission of HIV were occurring in the United States.... [The veteran] frequented high[-]risk establishments, took part in high[-]risk activities and his history of a six

to eight week long viral syndrome in late 1982 is significantly associated with initial HIV infection. He was astute enough to realize at that time that he had "gotten infected with AIDS" and this was a major cause of the anxiety symptoms he suffered over the next year but which he was unable to verbalize to military authorities due to discrimination concerns. Also supportive of his history of infection at that time was the fact that in 1981 he began living with a male lover he met in the [N]avy who died of AIDS in 1991. His lover also had high[-]risk exposures in New York City during 1982 and [t]he cause of illness was compatible with initial infection at that time.

After his service discharge and the availability of an HIV antibody test in 1985, [the veteran's] HIV infection was confirmed in December 1985 in Alabama. Except for anxiety problems, his health was quite stable until late 1991, as would be expected with an HIV infection originating in 1982. The average length of time from initial infection until significant HIV[-]related symptoms is ten years. His absolute CD4 count of less than 100/m3 in December 1991, his persistent lymphadenopathy, plus possible symptoms now of AIDS indicate a long[-]standing HIV infection of eight to ten years in length.

R. at 280–81. ("CD4" is a type of lymphocyte, THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 78 (16th ed. 1992).)

In July 1992, the RO obtained an August 1985 letter from a registered nurse apparently employed by the Monroe County, Florida, Jail, addressed to "Judge Esquinaldo", apparently a Florida state judge. R. at 278. The letter indicated that the veteran was then in jail and stated: "[The veteran] states he has 'A[IDS-]Related Complex' [ARC] which means he is highly suscept[i]ble to any bacteria". *Ibid.* (ARC is "a collection of symptoms that includes fever, weight loss, lymphadenopathy, and the presence of antibodies to the HTLV–III retrovirus and that is associated with the later development of AIDS", WEBSTER'S, at 18.)

In August 1992, the RO received a letter from Dr. Robert H. Latham, a private physi-

cian. Dr. Latham noted that the veteran had recently been referred to him for evaluation and treatment, and stated:

On review of his record, he clearly has history of developing adenopathy and fever in 1982 at a time when he was actually participating in unprotected homosexual activity in New York City. This most likely represented the period of acquisition for his HIV infection. As you know, he was in the military service at that time. At present he has advanced HIV disease with lymphadenopathy and is requiring chronic suppressive medications for that illness.

R. at 303.

In an August 1992 letter to the RO concerning the BVA's remand instructions, the veteran indicated, inter alia, that Dr. Warner "does not wish to make any further statements", and that additional evidence was available from a Dr. A.J. Fernandez. R. at 337–38. In August 1992, Dr. Warner returned to the RO its letter asking him to provide further information concerning "treatment [of the veteran] by you on or about May 1984"; at the bottom of the letter he wrote: "I advised HIV bl[oo]d test which [veteran] deferred. The reason for his visit was because of his fear of having AIDS." R. at 353.

In an August 1992 letter to the RO, Dr. A.J. Fernandez, a pathologist at Florida Keys Memorial Hospital, stated as follows:

In 1985 I was in charge of the Monroe County Jail Medical Services.

[The veteran] was brought to my attention for examination. Based on clinical history and physical examination I concluded that [he] had been infected with the A[IDS] virus; my clinical impression was that he was suffering from A[IDS]. This diagnosis had been confirmed by Dr. L.A. Warner.

R. at 456.

The RO obtained, apparently in August 1992, records of the veteran's May 1985 treatment at the University of South Alabama Medical Center. R. at 358–66. Those records document a complaint of right-ear pain and sore throat; laboratory reports in-

dicated that a "CBC [complete blood count] & Differential" test had yielded "normal" results. R. at 360. In September 1992, the RO issued a confirmed rating decision. R. at 368–69.

In October 1992, the RO received a letter from Dr. Stephen P. Raffanti, Director of the Nashville Metro AIDS Services and Assistant Professor of Medicine at Vanderbilt University. He wrote: "I have examined [the veteran] and reviewed his medical records from the [VAMC]. I concur with Drs. Harbison['s] and Swinger's opinions that [he] most likely became infected with HIV during 1982 while stationed near New York City." Supplemental (Supp.) R. at 1.

Sometime before November 1992, the RO received a copy of a March 1992 letter from one of the appellant's representatives to another of his representatives. Inter alia, the letter noted that the veteran had stated that he had received medical treatment from a Dr. Gennikais at Florida Keys Memorial Hospital in 1984; the letter discussed the advisability of seeking to obtain the records of such treatment. R. at 247.

In a November 10, 1992, decision, the Board once again remanded the veteran's claim to the RO. The Board instructed the RO to: (1) Contact the Monroe County, Florida, Jail and obtain any relevant health records; (2) contact Florida Keys Memorial Hospital and request the veteran's medical records from 1984 onward, including any HIV test results, and ascertain whether a Dr. Gennikais had been on the hospital's staff; (3) request from Dr. Fernandez "copies of any records upon which his statement of August 1992 [R. at 456–57] was based"; (4) in light of Dr. Swinger's statement that the veteran's HIV infection had been confirmed in December 1985, ask the veteran where he had been tested (in December 1985 and at any other time), so that the RO could then seek to obtain all HIV test reports; and (5) ask Dr. Swinger to explain the basis for his statement that the HIV infection had been confirmed in December 1985. R. at 385–88.

In a December 1992 letter concerning the remand instructions, the veteran informed the RO that, inter alia, the December 1985 date given by Dr. Swinger was not correct and that the first confirmation of his HIV infection was in December 1988 while he was incarcerated at the Cullman County, Alabama, Jail. R. at 402.

In a January 1993 letter to the RO, Dr. Swinger explained that his April 1992 letter contained a typographical error and that the date of the veteran's positive HIV test was December 1988, not December 1985. R. at 409. He stated:

> Although I did not see a copy of that test result, I spent two hours carefully interviewing [the veteran] to obtain a detailed personal history as well as carefully reviewing his medical records and have no reason to not to [sic] believe the validity of the history. . . .
>
> . . . I again refer you back to my letter of April 24, 1992. [The veteran's] medical and personal history is significantly indicative of a long standing HIV infection present since the early [19]80's.

R. at 409.

In a January 1993 letter, Dr. Fernandez stated only that he had reviewed the veteran's record at the local courthouse and seen a letter (apparently R. at 278) "addressed to Judge Esquinaldo indicating that [the veteran] had signs and symptoms consistent with A[IDS] as previously diagnosed". R. at 413.

In February 1993, the RO obtained a copy of a December 1988 Alabama Department of Public Health laboratory slip, captioned "HIV SEROLOGY REPORT", prepared while the veteran was incarcerated in the Cullman County Jail. R. at 426. Although the laboratory slip indicates that an "EIA" test was requested, and the slip is accompanied by the veteran's written authorization to release the results of HIV antibody testing (R. at 427), no such test results accompany the laboratory slip. R. at 426. ("EIA" is an enzyme immunoassay test, DORLAND'S, at 533.) Rather, the slip contains a notation to the effect that the veteran had undergone an HIV test in 1985 and that that test was positive and that the veteran was in 1985 diagnosed with ARC. Further, under the heading "PATIENT HISTORY SINCE 1978", the slip states a positive answer for "[Intravenous (IV)] Drug Use" and, under

the heading "SEXUAL EXPOSURE SINCE 1978", positive answers for "Homosexual/Bisexual Man" and "IV Drug User"; finally, the report states the veteran's sexual orientation as "bisexual". *Ibid.*

In March 1993, the RO again issued a confirmed rating decision, R. at 442, and on May 11, 1993, the Board issued the adverse decision here on appeal.

## II. The Board's Decision

At the outset of its decision, the Board, after having twice remanded the case to the RO for further development, stated that the claim was well grounded pursuant to 38 U.S.C. § 5107(a), that "the facts relevant to the issue on appeal have been properly and adequately developed", and that VA had complied with its statutory duty to assist. R. at 9.

The Board addressed the medical evidence submitted on behalf of the veteran's claim. With respect to Dr. Warner's statements that in May 1984 he had recommended that the veteran undergo an HIV blood test, the Board noted that "HIV testing was not available in 1984, as noted in several documents of record." R. at 12. The Board also noted that the medical records submitted by Dr. Warner revealed office visits from 1974 to 1978, with no visits subsequent to 1978. *Ibid.* Noting that Dr. Warner had stated that at the time of the veteran's May 1984 office visit he was then a student at Memphis State University (R. at 182), but that that university indicated that the veteran had first enrolled in "the summer of 1985" (R. at 305), the Board concluded that "the veteran's visit ... must have occurred no earlier than mid–1985 and that Dr. Warner's recollection of it as having been earlier is incorrect." *Ibid.*

Addressing Dr. Fernandez's August 1992 statement that the veteran had suffered from ARC in 1985, the Board noted that, when he was asked to provide records upon which that statement was based, Dr. Fernandez "merely referred to the August 1985 jail employee's letter to the judge". *Ibid.*

The Board noted that, although the December 1988 HIV serology laboratory slip from the Alabama Department of Public Health indicated that the veteran had been found to be HIV positive (and diagnosed with ARC) in 1985, "[a]ctual test results from 1985 are not in the file, and the veteran did not reply to the RO's request to identify where any 1985 HIV test was taken." R. at 13. The Board stated that the VA medical records dating from 1991 reporting that HIV was first diagnosed earlier in that year (R. at 99) conflict with the December 1988 HIV serology report. *Ibid.*

As to the March 1992 statement by Dr. Harbison, the VA physician, that the veteran gave an "accurate history of developing night sweats and lymph node swelling ... consistent with new seroconversion" and that she concurred with Dr. Warner's assessment that HIV infection occurred in service, the Board noted that the SMRs were negative for any complaints or findings of night sweats or adenopathy during service. The Board stated:

> Dr. Warner mentions the veteran's concern about those symptoms when he was seen after service. As already explained, we do not find Dr. Warner's recollection of the date to be correct, so in all likelihood it was not until 1985 that the veteran was concerned about night sweats, etc. Accordingly, while [Dr. Harbison] may well have been correct in stating that current (1991 to 1992) findings "bespeak longstanding infection", neither the [SMRs] nor early post-service evidence provides a basis for reasonably associating the veteran's AIDS with service.

R. at 13.

Turning to Dr. Swinger's April 1992 statement, the Board noted that his opinion that the veteran's had experienced a "six to eight week-long viral syndrome in late 1982" that was "significantly associated with initial HIV infection" was not supported by the SMRs, which show only "gastrointestinal complaints of about two weeks['] duration in September 1982", and which document "a long history of the same complaints throughout childhood". As to Dr. Swinger's statement that while in service the veteran had begun to live with a male lover, the Board stated that "if that individual was the source of the veteran's infection, it would be no more than speculation to conclude that the virus was transmit-

ted during service, especially since we do not know when the lover became infected." R. at 14.

As to Dr. Latham's August 1992 statement that the veteran "clearly" had a history of developing adenopathy and fever in 1982 that likely represented the onset of HIV infection (R. at 303), the Board stated: "[T]hat history clearly conflicts with the veteran's [SMRs], the only medical evidence contemporaneous with his service. On the other hand, it is consistent with the ... symptoms noted by Dr. Warner, apparently in 1985." R. at 14.

The Board discounted the statement by the veteran's former shipmate because that statement "was based on recollections of events about 10 years earlier and does not indicate that the veteran had been infected with the AIDS virus or even what the claimed symptoms of AIDS were. In any event, the veteran would not have been qualified to determine the diagnosis of any medical problem." *Ibid.*

The Board concluded:

[T]he various medical statements supporting the veteran's claim are based on a history that is not credible. The veteran appears not to be a reliable historian. . . . Nevertheless, the symptoms relied upon as showing seroconversion in service actually are not shown to have been present in service or until the veteran was seen by Dr. Warner, apparently no earlier than 1985. Also, the various opinions seem to overlook the fact that for about eight years after service the veteran continued to have an intimate relationship with an individual who died from AIDS in 1991. . . . To find that his current AIDS resulted from service is simply inconsistent with the facts of record. Service connection is not warranted for AIDS as having been incurred in or aggravated by active service.

*Ibid.*

### III.  Arguments of the Parties

**Appellant's Brief:** The appellant, through counsel, argues that reversal is warranted because the BVA based its decisions on clearly erroneous findings of fact. Inter alia, he argues that all medical opinions of record support a finding of in-service HIV infection.

Br. at 7. He argues that the Board, pursuant to 38 C.F.R. § 3.303(a) (1993), was required to consider all pertinent medical and lay evidence, and could not reject the medical opinions of record on the stated basis that the symptoms on which the opinions were based were "not shown to have been present in service". Br. at 7 (quoting R. at 14). The appellant, citing *Bucklinger v. Brown,* 5 Vet. App. 435 (1993), and other cases, argues that the BVA improperly substituted its own medical judgment when it rejected the opinions by Drs. Swinger, Harbison, and Latham. Further, the appellant argues that the Board also violated the dictates of *Colvin v. Derwinski,* 1 Vet.App. 171 (1991), when it asserted that the medical opinions of record "seem to overlook the fact that for about eight years after service the veteran continued to have an intimate relationship with an individual who died of AIDS in 1991" (R. at 14); the appellant states that the statement is both factually erroneous (because Dr. Swinger had noted this relationship, R. at 281) and legally erroneous because the statement implies the unsubstantiated medical opinion that the veteran contracted his HIV infection from that individual. Br. at 8–9.

The appellant next argues that "[t]hough numerous symptoms of initial HIV infection are of record in [a]ppellant's [SMRs], a total absence of symptoms would not defeat [his] claim in the face of the other medical evidence of record", citing to *Hanson v. Derwinski,* 1 Vet.App. 512 (1991), *Caldwell v. Derwinski,* 1 Vet.App. 466 (1991), and *Gilbert v. Derwinski,* 1 Vet.App. 49 (1990). Br. at 9 n. 13. He also asserts that the in-service diagnoses of URI and gastrointestinal problems represented "misdiagnosis" and argues that such misdiagnosis, "though understandable, should not work to deprive [a]ppellant of much needed benefits", citing to 38 C.F.R. § 3.307(c) (1993) ("Symptomatology shown in the prescribed period may have no particular significance when first observed, but in light of subsequent developments it may gain considerable significance."). Br. at 10 n. 14.

Finally, the appellant argues that, should the Court find the Board's findings of fact not subject to reversal as clearly erroneous, reversal is required because the Board failed

to apply the benefit-of-the-doubt doctrine codified at 38 U.S.C. § 5107(a) and construed in *Gilbert, supra.* Br. at 9–10.

**Secretary's Brief:** In his brief, the Secretary argues that the Board's decision should be affirmed because "there is no probative evidence of record linking [a]ppellant's AIDS to his service". Br. at 4. He asserts that the first "confirmed" diagnosis of HIV infection was in December 1988, five years after service, and that the supportive statements by Drs. Harbison, Swinger, and Latham were rejected by the Board "because they were based on a history, provided by [a]ppellant, that was not credible." Br. at 5. The Secretary argues: "[I]n the context of this case, these 'medical opinions' are no less speculative than the 'may or may not' opinion that this Court rejected in *Tirpak v. Derwinski,* 2 Vet.App. 609[, 611] (1992)". Br. at 6. The Secretary notes that in *Kern v. Brown,* 4 Vet.App. 350, 352 (1993), the Court stated: "It is not the function of the Court to determine whether appellant's HIV was contracted during service, but rather to decide whether the factual determinations made by the Board constitute clear error." The Secretary concludes by urging the Court to affirm the Board's factual conclusions because they have a plausible basis in the record. Br. at 6.

**Appellant's Reply Brief:** In reply, the appellant argues that the Secretary's citation to *Kern* is inapposite because there the veteran had offered no medical evidence in support of his HIV-service-connection claim, while the present appellant has submitted several supportive medical statements. He also argues that the Secretary's brief wrongly states that the doctors' opinions "necessarily relied on" a history provided by the appellant; he states that Drs. Swinger, Harbison, and Latham all asserted that they had reviewed the veteran's medical history, and all concluded that his version of his medical history was consistent with both his SMRs and his current condition. Br. at 3. Finally, the appellant notes that in *Kern* the Court stated: "The possibility that [the appellant] might have contracted HIV in the service is a medical judgment that can only be made by medical professionals." Thus, he argues,

*Kern* does not support but instead contradicts the Secretary's arguments. Br. at 5.

## IV. Analysis

■■ A determination as to the cause of a disability is a finding of fact, which the Court reviews under a "clearly erroneous" standard. 38 U.S.C. § 7261(a)(4). Under that standard, "if there is a 'plausible' basis in the record for the factual determinations of the BVA, even if this Court might not have reached the same factual determinations, we cannot overturn them." *See Gilbert,* 1 Vet. App. at 53.

■■■ Pursuant to 38 U.S.C. § 7104(d)(1), the Board is required to provide a written statement of the reasons or bases for its findings and conclusions on all material issues of fact and law presented on the record; the statement must be adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court. *See Suttmann v. Brown,* 5 Vet.App. 127, 133 (1993); *Masors v. Derwinski,* 2 Vet.App. 181, 188 (1992); *Hatlestad v. Derwinski,* 1 Vet.App. 164, 169 (1991) (*Hatlestad I*); *Gilbert,* 1 Vet.App. at 57. To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for rejecting any evidence favorable to the veteran. *See Simon v. Derwinski,* 2 Vet.App. 621, 622 (1992); *Abernathy v. Principi,* 3 Vet. App. 461, 465 (1992); *Hatlestad I, supra; Gilbert; supra.* The degree of specificity required of the Board's reasons or bases is particularly great when, as here, the Board's conclusions are of a "scientific or medical nature". *Sammarco v. Derwinski,* 1 Vet. App. 111, 112 (1991). Moreover, the Board may not base a decision on its own unsubstantiated medical conclusions but, rather, may reach a medical conclusion only on the basis of independent medical evidence in the record or adequate quotation from recognized medical treatises. *See Thurber v. Brown,* 5 Vet.App. 119, 126 (1993); *Hatlestad v. Derwinski,* 3 Vet.App. 213, 217 (1992) (*Hatlestad II*); *Colvin,* 1 Vet.App. at 174.

### A. In-service Symptomatology

■ Much of the Board's discussion of the evidence focuses on the assertions contained in the medical evidence of record that the appellant's in-service symptomatology was a manifestation of the onset of HIV infection, and the Board's discussion concludes, not implausibly, that the record contains several inconsistencies with respect to when the HIV infection was first diagnosed. Based on its evaluation of the evidence, the Board made the following finding of fact: "HIV seropositivity or AIDS was not objectively demonstrated in service." R. at 8. Although the Court does not at this point find this conclusion to be clearly erroneous, the Court does hold that the Board relied on an unsubstantiated—and therefore impermissible—medical conclusion in determining that the veteran's in-service symptomatology did not represent a manifestation of HIV infection. Specifically, in support of its finding, the Board concluded as follows: "[N]one of [the veteran's] upper respiratory or gastrointestinal symptoms in service are shown to have been a manifestation of seroconversion, ARC[,] or AIDS." R. at 14. The Board also made the following unsubstantiated medical conclusion: "[N]either the [SMRs] nor early post-service evidence provides a basis for reasonably associating the veteran's AIDS with service." R. at 13.

In reaching both of the above conclusions, the Board failed to cite any medical evidence of record or quote from a recognized medical treatise in rejecting the medical opinions of record. Because the Board relied on its own unsubstantiated medical conclusions, remand is required for it to readjudicate the claim based on independent medical evidence. *See Hatlestad II, supra; Colvin, supra.*

### B. Onset of HIV Infection

■ Having found that the appellant's in-service symptomatology was not "shown to have been a manifestation of seroconversion, ARC[,] or AIDS", the Board apparently considered that finding to be dispositive of the issue of service connection for AIDS. But there is a second issue: Whether the appellant became infected with HIV during service. This issue is distinct from the issue of whether he exhibited symptoms of HIV infection during service. Accordingly, the appellant's claim for service connection for AIDS is not defeated by a determination that his in-service symptomatology was not a manifestation of HIV infection.

The Court notes that the facts of the present case are readily distinguishable from those presented to the Court in *Kern.* There, the Court noted that "[a]ppellant's clinical evidence, including SMRs, show no indication of HIV during ... service", and found that the Board's denial of service connection had a plausible basis. *Kern,* 4 Vet. App. at 353. However, the Court there premised its decision not merely on the lack of in-service HIV *symptomatology,* but also on the "lack of evidence connecting HIV *exposure* to service". *Ibid.* (Emphasis added.) Here, the appellant has presented his own consistent statements about in-service activities that may have exposed him to the HIV, and those statements are buttressed by the medical opinions of Drs. Swinger, Raffanti, and Harbison that the extent of the veteran's current condition is indicative of exposure at that time.

■ In its decision, the Board failed to address Dr. Swinger's June 1992 opinion that the veteran's post-service symptomatology supported a finding that "[the veteran] became infected with [HIV] during 1982 while stationed near New York City" (R. at 280); Dr. Swinger stated that "[the veteran's] absolute CD4 count of less than 100/m3 in December 1991, his persistent lymphadenopathy, plus possible symptoms now of AIDS indicate a long standing HIV infection of eight to ten years in length." R. at 281. Similarly, the Board failed to address the October 1992 letter from Dr. Raffanti, who stated that, having examined the veteran and reviewed his VAMC medical records, he concurred in Dr. Swinger's opinion that the veteran "most likely became infected with HIV during 1982 while stationed near New York City." Supp.R. at 1. The Board also failed to address adequately Dr. Harbison's March 1992 opinion connecting the veteran's then-current symptomatology to in-service infection: "Current level of immune deficiency and low T4 count certainly bespeak long-

standing infection, and I have no doubt that he did acquire it in New York City ... during [his military service]". R. at 196, 204. Remand is thus required for the BVA to readjudicate the claim, make appropriate findings of fact and conclusions of law, and issue a new decision, which is supported by an adequate statement of reasons or bases that "identif[ies] those findings [the Board] deems crucial to its decision and account[s] for the evidence which it finds to be persuasive or unpersuasive" and takes into account all applicable law and regulation. *Gilbert*, 1 Vet.App. at 57.

### C. Benefit-of-the Doubt Doctrine

■ When the Board has made its determinations as to the credibility and probative value of all pertinent evidence of record and " 'there is an approximate balance of positive and negative evidence,' the veteran prevails by operation of [section 5107(b) ]." *Gilbert*, 1 Vet.App. at 56. "A properly supported and reasoned conclusion that a fair preponderance of the evidence is against the claim necessarily precludes the possibility of the evidence also being in 'an approximate balance.' " *Id.* at 58. "In a case where there is significant evidence in support of an appellant's claim ..., the Board must provide a satisfactory explanation as to why the evidence was not in equipoise" so as to require application of the benefit-of-the-doubt rule. *Williams (Willie) v. Brown*, 4 Vet.App. 270, 273–74 (1993). In the instant case, the unrebutted medical opinions proffered by Drs. Swinger, Raffanti, and Harbison constituted "significant evidence in support of" the appellant's claim that his AIDS had its onset in service, as discussed in part IV.B., above, and triggered the Board's duty to address the benefit-of-the-doubt doctrine. The Board did not comply with the Court's *Williams* holding and must do so on remand.

### D. Clear Error

The appellant, on the ground that the Board's conclusions are not supported by a "plausible" basis in the record, seeks reversal of the Board's denial of service connection. The Court does not reach that issue because not only have the Board's *Colvin* violations

and "reasons or bases" failures denied "the veteran ... the benefit of the Board's rationale, but this Court's judicial review responsibilities are hampered by the failure of the Board to provide adequate 'reasons or bases' for its findings in accordance with [38 U.S.C. § 7104(d)(1) ]." *Willis v. Derwinski*, 1 Vet. App. 63, 66 (1990); *compare Willis v. Derwinski*, 1 Vet.App. 66 (1991) (reversing as clearly erroneous Board's denial of service connection).

### E. Additional Evidence

■ As pointed out in the Secretary's brief, Br. at 7, the appellant submitted, as part of his brief, excerpts from medical treatises. Appellant's Br. at 1, 3, 5. This Court is precluded by statute from considering evidence which was not contained in the "record of proceedings before the Secretary and the Board". 38 U.S.C. § 7252(b); *Rogozinski v. Derwinski*, 1 Vet.App. 19 (1990) (review in the Court shall be on the record of proceedings before the Secretary and the BVA). Because these excerpts were not part of the proceedings before the Secretary and the BVA, the Court has not considered the excerpts in footnotes 1, 3, and 6 of the appellant's brief.

### V. Conclusion

Based on the foregoing analysis, the Court vacates the May 11, 1993, BVA decision and remands the matter to the Board for expedited readjudication, consistent with this opinion, on the basis of all evidence of record and applicable law and regulation. *See* 38 U.S.C. § 7104(a); *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991). If on remand the Board determines that the medical evidence of record is insufficient, or that the complexity of the medical evidence so warrants, it should seek the opinion of an independent medical expert (IMO), so that the evaluation of the disability will be a fully informed one. *See* 38 U.S.C. § 7109; *Littke v. Derwinski*, 1 Vet.App. 90, 92 (1990). On remand, the appellant "will be free to submit additional evidence and argument" (including the medical-treatise evidence improperly included in his brief). *Quarles v. Derwinski*, 3 Vet.App. 129, 141 (1992). Consistent with the Court's

decision to expedite briefing and decision of this appeal in view of the appellant's fragile health, the Board is directed to issue its decision not later than 90 days, or 120 days if an IMO is obtained, after the date of this opinion. A final decision by the Board following the remand herein ordered will constitute a new decision which may, if adverse, be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the new final Board decision is mailed to the appellant.

VACATED AND REMANDED.

MANKIN, Judge, concurring:

This case presents a matter of considerable sensitivity in today's society. I recognize that the burden on the Government and this Court is great to insure that constitutional and legal principles are followed scrupulously. However, I question whether those principles were followed in this case by the Government.

In its adjudication process, the VA has determined that it will not consider the specific residuals of "HIV (Human Immunodeficiency Virus) related illness ... to be the result of willful misconduct" without specifying the probable method of contracting the illness. DEPARTMENT OF VETERANS AFFAIRS, DEPARTMENT OF VETERANS BENEFITS MANUAL; ADJUDICATION PROCEDURE, Part VI, § 7.29 (March 17, 1992) (M21–1 Manual). I find the VA M21–1 Manual troubling because it condones conduct which the Congress has declared to be illegal. For example, Congress has clearly stated that homosexual acts of sodomy are proscribed conduct within the military. 10 U.S.C.A. §§ 1162–63, 1169–70, 1172–73 (West 1983); 10 U.S.C.A. § 925 (West 1983); *United States v. Johnson,* 27 M.J. 798 (Air Force Ct.Mil.Rev.1988), *aff'd,* 30 M.J. 53 (U.S.Ct.Mil.App.1990), *cert. denied,* 498 U.S. 919, 111 S.Ct. 294, 112 L.Ed.2d 248 (1990). The VA may not condone activity through its regulations which the Congress has proscribed. *United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977).

The issue of the appellant's conduct was not addressed below by the VA or the Board, though the evidence before both the VA and the Board seems to indicate that the appellant's illness was contracted through statutorily proscribed means rather than through, for example, a dirty needle or tainted blood transfusion. Yet, by the VA's own regulations, the appellant's conduct should have been considered. 38 U.S.C.A. § 101(16) (West 1991). For a disability to be service connected, it must have been incurred in the line of duty. *Id.* A disability incurred during active military service will be considered to have been incurred in the line of duty unless the disability was the result of the claimant's own willful misconduct, 38 U.S.C.A. § 105(a) (West 1991); 38 C.F.R. §§ 3.1(m), 3.301(a)–(b) (1993), which is defined as "an act involving ... [a] known prohibited action," *Smith v. Derwinski,* 2 Vet.App. 241, 243–44 (1992). Accordingly, until the foregoing threshold issue is addressed, the majority's detailed legal discussion is premature. Therefore, for the foregoing reasons, I concur in the result only.