Citation Nr: 1744022 
Decision Date: 09/27/17 Archive Date: 10/10/17

DOCKET NO. 13-11 846 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Nashville, Tennessee


THE ISSUES

1. Entitlement to service connection for a left ear hearing loss disability.

2. Entitlement to an increased rating, in excess of 30 percent prior to January 12, 2016, and in excess of 70 percent thereafter, for post-traumatic stress disorder ("PTSD"). 


REPRESENTATION

Veteran represented by: Disabled American Veterans


WITNESSES AT HEARING ON APPEAL

The Veteran and his wife



ATTORNEY FOR THE BOARD

M. Timbers, Associate Counsel


INTRODUCTION

The Veteran served as a member of the United States Air Force, with active duty service from August 1969 through August 1973. 

This appeal comes to the Board of Veterans' Appeals ("Board") from two rating decisions issued by the Department of Veterans Affairs ("VA") Regional Office ("RO") in Nashville, Tennessee (hereinafter Agency of Original Jurisdiction ("AOJ")). In a July 2011 rating decision, the AOJ awarded the Veteran entitlement to service connection for PTSD, and assigned a 30 percent disability rating effective August 31, 2010. Thereafter, in a January 2012 rating decision, the AOJ denied the Veteran's claim for entitlement to a bilateral hearing loss disability. 

In September 2014, the Veteran testified before the undersigned Veterans Law Judge at a videoconference hearing. A transcript of this hearing has been reviewed and associated with the Veteran's claims file. 

The Veteran's appeal has previously been before the Board. In March 2015 the Board remanded the Veteran's appeal to the AOJ for further development. Specifically, the Board directed the AOJ to provide the Veteran with updated VA examinations to determine the current severity of his PTSD disability. The AOJ was further directed to obtain a medical opinion as to the etiology of the Veteran's bilateral hearing loss disability. A review of the claims file indicates that the requested development has been completed, and that the appeal has been properly returned to the Board for further appellate consideration. See Stegall v. West, 11 Vet. App. 268 (1998).

During the pendency of the Veteran's appeal, the AOJ issued a January 2016 rating decision, which granted the Veteran's claims for entitlement to service connection for a right ear hearing loss disability and tinnitus. The AOJ assigned a non-compensable rating for the Veteran's right ear hearing loss disability and assigned a 10 percent evaluation for the Veteran's bilateral tinnitus disability, effective October 26, 2011. This grant of service connection, for a right ear hearing loss disability and tinnitus, represented a full grant of the benefits sought on appeal. See Grantham v. Brown, 114 F.3d. 1156 (Fed. Cir. 1997) (where an appealed claim for service connection is granted during the pendency of the appeal, a second notice of disagreement (NOD) must thereafter be timely filed to initiate appellate review of the claim concerning "downstream" issues such as the compensation level assigned for the disability and the effective date); See also 38 C.F.R. § 20.200 (2016). As such, these issues are no longer on appeal before the Board. 

The Board additionally observes that the AOJ, in the January 2016 rating decision, granted the Veteran entitlement to an increased evaluation, of 70 percent, for his service-connected PTSD disability, effective January 12, 2016. As this award does not represent a full grant of all the benefits sought on appeal, the Board has retained jurisdiction over the Veteran's appeal. See AB v. Brown, 6 Vet. App. 35, 38 (1993)(holding that a claimant is presumed to be seeking the highest evaluation assignable). Additionally, the Board has recharacterized the issue on appeal, as reflected on the title page of this decision, to include the Veteran's appeal of staged disability ratings. 

This appeal was processed using Virtual VA and the Veterans Benefits Management System ("VBMS"). Accordingly, any future consideration of this Veteran's case should take into consideration the existence of this electronic record.


FINDINGS OF FACT

1. The Veteran has a current left ear hearing loss disability for VA compensation purposes that is the result of hazardous noise exposure, as a mechanic, throughout the Veteran's active duty and reserve military service. 

2. Throughout the period on appeal, the Veteran's service-connected PTSD is manifested by psychiatric symptoms causing occupational and social impairment, with deficiencies in most areas; total social and occupational impairment is not shown during any portion of the period on appeal. 


CONCLUSIONS OF LAW

1. Resolving all reasonable doubt in his favor, the Veteran has a left ear hearing loss disability which was incurred during active service. 38 U.S.C.A. §§ 1101, 1110, 1112, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.307, 3.309, 3.385 (2016).

2. The criteria for an initial 70 percent evaluation, but no greater, for the Veteran's service connected PTSD, is met for the period prior to January 12, 2016. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 4.1, 4.2, 4.3, 4.6 4.7, 4.10, 4.21, 4.126, 4.130, Diagnostic Code 9411 (2016).

3. The criteria for an increased initial evaluation, in excess of 70 percent, for the service-connected PTSD has not been met or approximated at any point during the period on appeal. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 4.1, 4.2, 4.3, 4.6 4.7, 4.10, 4.21, 4.126, 4.130, Diagnostic Code 9411 (2016).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Before assessing the merits of the appeal, VA's duties under the Veterans Claims Assistance Act ("VCAA") must be examined. The VCAA provides that VA shall apprise a claimant of the evidence necessary to substantiate his or her claim for benefits and that VA shall make reasonable efforts to assist a claimant in obtaining evidence unless no reasonable possibility exists that such assistance will aid in substantiating the claim. See 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126 (West 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159 and 3.326(a) (2016).

In regards to the Veteran's claims for entitlement to service connection, the Board notes that VA notified the Veteran, in correspondence November 2011 of the information and evidence needed to substantiate and complete his claim including what part of that evidence he was to provide and what part VA would attempt to obtain for him. See 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b)(1); Quartuccio v. Principi, 16 Vet. App. 183, 187 (2002). This letter informed the Veteran to submit medical evidence relating the claimed disabilities to active service and noted other types of evidence the Veteran could submit in support of his claim. The Veteran also was informed of when and where to send the evidence. After consideration of the contents of this letter, the Board finds that VA has satisfied substantially the requirement that the Veteran be advised to submit any additional information in support of his claim. See Pelegrini v. Principi, 18 Vet. App. 112 (2004). Additional notice of the five elements of a service-connection claim was provided in the November 2011VCAA notice, as is required by Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006).

The Veteran's claim for an increased initial rating for his PTSD is considered a "downstream" element of the AOJ's grant of service connection. For such downstream issues, notice under 38 U.S.C.A. § 5103(a) and 38 C.F.R. § 3.159 is not required in cases where such notice was afforded for the originating issue of service connection. See VAOPGCPREC 8-2003 (Dec. 22, 2003). Courts have held that once service connection is granted, the claim is substantiated, additional notice is not required, and any defect in the notice is not prejudicial. See Hartman v. Nicholson, 483 F.3d 1311 (Fed. Cir. 2007), see also Dunlap v. Nicholson, 21 Vet. App. 112 (2007). In correspondence dated July 2010, VA notified the Veteran of the information and evidence needed to substantiate and complete his claim for service connection of PTSD, including what part of the evidence he was to provide and what part VA would attempt to obtain for him. See 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b)(1); see also Quartuccio v. Principi, 6 Vet. App. 183, 187 (2002). 

With respect to the timing of the notice, the Board points out that the Court has held that a VCAA notice, as required by 38 U.S.C.A. § 5103(a), must be provided to a Veteran before the initial unfavorable agency of original jurisdiction decision on a claim for VA benefits. See Pelegrini, 18 Vet. App. at 112. Here, all relevant notice was issued prior to the currently appealed rating decisions; thus, this notice was timely. Any defect in the timing or content of the notice provided to the Veteran and his service representative has not affected the fairness of the adjudication. See Mayfield, 444 F.3d at 1328. 

The Board is aware of the decision in Vazquez-Flores v. Peake, 22 Vet. App. 37 (2008) in which the Court held that, for an increased-compensation claim, section § 5103(a) requires, at a minimum, VA notify the claimant that, to substantiate a claim, the claimant must provide, or ask VA to obtain, medical or lay evidence demonstrating a worsening or increase in severity of the disability and the effect that worsening has on the claimant's employment and daily life. Relying on the informal guidance from VA's Office of General Counsel (OGC) and a VA Fast Letter issued in June 2008 (Fast Letter 08-16; June 2, 2008), the Board finds that Vazquez-Flores is not applicable. According to OGC, because this appeal arises from an initial rating decision, VCAA notice obligations are satisfied fully once service connection has been granted. Any further notice and assistance requirements are covered by 38 U.S.C. §§ 5104(a), 7105(d)(1), and 5103A as part of the appeals process, upon the filing of a timely notice of disagreement ("NOD") with respect to the initial rating or effective date assigned following the grant of service connection.

In Dingess, the Court held that, in cases where service connection has been granted and an initial disability rating and effective date have been assigned, the typical service-connection claim has been more than substantiated, it has been proven, thereby rendering section 5103(a) notice no longer required because the purpose that the notice is intended to serve has been fulfilled. See Dingess, 19 Vet. App. at 490-91. To the extent that Dingess requires more extensive notice as to potential downstream issues such as disability rating and effective date, because the currently appealed rating decision was fully favorable to the Veteran on the issue of service connection for PTSD, and because the Veteran was fully informed of the evidence needed to substantiate this claim, the Board finds no prejudice to the Veteran in proceeding with the present decision. See also Bernard v. Brown, 4 Vet. App. 384, 394 (1993).

The Board also finds that VA has complied with the VCAA's duty to assist by aiding the Veteran in obtaining evidence and affording him the opportunity to give testimony before the Board. It appears that all known and available records relevant to the issues on appeal have been obtained and associated with the Veteran's claims file; the Veteran has not contended otherwise.

The Veteran's electronic paperless claims files in Virtual VA and in VBMS have been reviewed. The Veteran also does not contend, and the evidence does not show, that he is in receipt of Social Security Administration ("SSA") disability benefits such that a remand to obtain his SSA records is required.

The Veteran has been additionally been afforded a VA examination which addressed the Veteran's reported symptoms, frequency, and severity and the interference these symptoms cause in his ability to complete basic daily tasks. 38 U.S.C.A. § 5103A(d); 38 C.F.R. § 3.159(c)(4); McLendon v. Nicholson, 20 Vet. App. 79 (2006). Given that the pertinent medical history was noted by the examiner, these examination reports sets forth detailed examination findings in a manner which allows for informed appellate review under applicable VA laws and regulations. Thus, the Board finds the examinations of record are adequate for rating purposes and an additional examination is not necessary regarding the claim adjudicated in this decision. See 38 C.F.R. §§ 3.326, 3.327, 4.2; See also Stegall, 11 Vet. App. 268 at 271.

The Veteran was afforded the opportunity to appear and testify before the undersigned Veterans Law Judge ("VLJ") at a videoconference hearing in September 2014. In Bryant v. Shinseki, 23 Vet. App. 488 (2010), the Court held that 38 C.F.R. § 3.103(c)(2) requires that the VLJ who conducts a hearing fulfill two duties to comply with the above regulation. These duties consist of (1) the duty to fully explain the issues and (2) the duty to suggest the submission of evidence that may have been overlooked. Here, during the August 2012 hearing, the VLJ noted the basis of the prior determination and explained the elements of the claims that were lacking to substantiate the Veteran's claims for benefits. The VLJ specifically noted the issues on appeal. The Veteran was assisted this hearing by his representative, Disabled American Veterans. In addition, the VLJ sought to identify any pertinent evidence not currently associated with the claims file that might have been overlooked or was outstanding that might substantiate the claims. As such, the Board finds that, consistent with Bryant, the VLJ complied with the duties set forth in 38 C.F.R. § 3.103(c)(2) and that any error in notice provided during the Veteran's hearing constitutes harmless error.

Based upon the above, the Board finds that VA has done everything reasonably possible to notify and to assist the Veteran and no further action is necessary to meet the requirements of the VCAA. Moreover, the neither the Veteran nor his representative have advanced any procedural arguments in relation to VA's duties to notify and assist. See Scott v. McDonald, 789 F.3d 1375 (Fed. Cir. 2015) (holding that "absent extraordinary circumstances . . . we think it is appropriate for the Board and the Veterans Court to address only those procedural arguments specifically raised by the veteran . . ."). Hence, there is no error or issue that precludes the Board from addressing the merits of this appeal.

Lastly, the Board has thoroughly reviewed all the evidence in the Veteran's claims file. Although the Board has an obligation to provide reasons and bases supporting this decision, there is no need to discuss, in detail, all of the evidence submitted by the Veteran or on his behalf. See Gonzalez v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000) (the Board must review the entire record, but does not have to discuss each piece of evidence). The analysis below focuses on the most salient and relevant evidence and on what this evidence shows, or fails to show, on the claims. The Veteran must not assume that the Board has overlooked pieces of evidence that are not explicitly discussed herein. See Timberlake v. Gober, 14 Vet. App. 122, 128-30 (2000) (the law requires only that the Board address its reasons for rejecting evidence favorable to the Veteran).


Governing Rules and Regulations for Entitlement to Service Connection:

In seeking VA disability compensation, a Veteran generally seeks to establish that a current disability results from disease or injury incurred in or aggravated by service. 38 U.S.C.A. § 1131. "Service connection" basically means that the facts, shown by evidence, establish that a particular injury or disease resulting in disability was incurred coincident with service in the Armed Forces, or if preexisting such service, was aggravated therein. 38 C.F.R. § 3.303.

As a general matter, service connection requires competent evidence showing: (1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service - the so-called "nexus" requirement. Holton v. Shinseki, 557 F.3d 1363, 1366 (Fed. Cir. 2009) (quoting Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004)). 

VA regulations recognize an additional, alternative, method of entitlement to service connection for certain chronic diseases. Specifically, if the evidence of record reveals the Veteran has a current diagnosis that was chronic in service, or, if not chronic, that was seen in service with continuity of symptomatology demonstrated thereafter. 38 C.F.R. § 3.303(b); Savage v. Gober, 10 Vet. App. 488, 494-97 (1997). However, in Walker, the Federal Circuit overruled Savage and limited the applicability of the theory of continuity of symptomatology in service connection claims to those disabilities explicitly recognized as "chronic" in 38 C.F.R. § 3.309(a). See Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013); see also Fountain v. McDonald, 27 Vet. App. 258 (2015) (adding tinnitus as an "organic disease of the nervous system" to the list of disabilities explicitly recognized as "chronic" in 38 C.F.R. § 3.309(a)).

As applied to the Veteran's instant appeal, the Board notes that sensorineural hearing loss is enumerated as "chronic" disabilities under 38 C.F.R. § 3.309(a). As such, the theory of continuity of symptomatology remains valid in adjudicating the Veteran's claim for entitlement to service connection for a left ear sensorineural hearing loss disability. 

In addition to the above described VA regulations, entitlement to service connection for impaired hearing is subject to additional VA regulations. Specifically, a hearing impairment constitutes a disability for VA purposes when auditory threshold in any of the frequencies 500, 1000, 2000, 3000, or 4000 Hertz is 40 decibels or greater; or when the auditory thresholds for at least three of the frequencies 500, 1000, 2000, 3000, or 4000 Hertz are 26 decibels or greater; or when speech recognition scores using the Maryland CNC Test are less than 94 percent. 38 C.F.R. § 3.385. The Court has held that the "the threshold for normal hearing is from 0 to 20 dB [decibels], and higher threshold levels indicate some degree of hearing loss." Hensley v. Brown, 5 Vet. App. 155, 157 (1993).

The determination of whether the requirements of service connection have been met is based on an analysis of all the evidence of record and the evaluation of its credibility and probative value. See Baldwin v. West, 13 Vet. App. 1, 8 (1999). In making these determinations, the Board must consider and assess the credibility and weight of all evidence in the claim file, including the medical and lay evidence, to determine its probative value. In doing so, the Board must provide its reasoning for rejecting any evidence favorable to the claimant. See Masors v. Derwinski, 2 Vet. App. 181 (1992); Wilson v. Derwinski, 2 Vet. App. 614, 618 (1992); Barr v. Nicholson, 21 Vet. App. 303 (2007).

When there is an approximate balance of evidence regarding the merits of an issue material to the determination of the matter, the benefit of the doubt in resolving each issue shall be given to the claimant. See 38 U.S.C.A. § 5107; 38 C.F.R. §§ 3.102, 4.3. A claimant need only demonstrate an approximate balance of positive and negative evidence in order to prevail. See Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990). For a claim to be denied on the merits, a preponderance of the evidence must be against the claim. See Alemany v. Brown, 9 Vet. App. 518, 519 (1996).

That being the relevant, generalized law applicable to the Veteran's claim, the Board observes that the Veteran has a current left ear hearing loss disability, under VA regulations. See e.g. December 2011 VA Examination. Therefore, the Board finds the Veteran has satisfied the first element of service connection, the existence of a current left ear hearing loss disability. See Boyer v. West, 210 F.3d 1351, 1353 (Fed. Cir. 2000).

The Board additionally finds that the Veteran was exposed to loud noises during his active duty service. The Veteran's DD 214 reflects that his military occupational specialty ("MOS") was an airplane mechanic. The Department of Defense's Duty MOS Noise Exposure Listing indicates that an MOS as a mechanic involved a "high" probability of nose exposure during service. In statements to the Board, the Veteran has reported a significant in-service exposure to acoustic trauma, including jet engine noises. See e.g. October 2011 Statement in Support of Claim. As such, the Board finds the Veteran was exposed to acoustic trauma, in the form of loud noises, during his active duty service.

Therefore, the primary question before the Board is whether the Veteran's in-service noise exposure caused his current left ear hearing loss. Throughout his appeal, the Veteran asserts his current left ear hearing loss was caused by his exposure to excessive noise during service, including jet engine noises. As a lay person, the Veteran is competent to report what comes to him through his senses, such as experiencing difficulties hearing. Layno v. Brown, 6 Vet. App. 465 (1994). However, the Veteran lacks the medical training and expertise to provide a complex medical opinion as to the etiology of sensorineural hearing loss. Jandreau v. Nicholson, 492 F. 3d 1372 (Fed. Cir. 2007). Therefore, the Board must next evaluate the medical evidence, specifically the Veteran's service treatment records, to determine whether a nexus between his current left ear hearing loss and his in-service noise exposure exists. 

A review of the Veteran's service medical records shows he was administered three separate audiological examinations during his active duty service. The first examination, dated August 1969, was performed during the Veteran's entrance into service. The second examination, dated September 1970, was administered during the middle of the Veteran's active duty service as part of his flight physical examination. Thereafter, a third examination was provided upon the Veteran's separation from Active duty service, in March 1973. The examination results are summarized in the table below:



HERTZ


LEFT
500
1000
2000
3000
4000
August 1969
Entrance Exam
15
10
10
15
10
September 1970
Flight Physical 
25
5
5
5
0
March 1973
Separation Exam
10
5
10
10
5

In reviewing these results, the Board observes that the Veteran was shown to have some degree of a left ear hearing loss disability during his September 1970 flight physical examination. As noted above, the Court has held that, "the threshold for normal hearing is from 0 to 20 dB [decibels] and higher threshold levels indicate some degree of hearing loss." See Hensley v. Brown, 5 Vet. App. 155, 157 (1993). Therefore, the results of this audiometric testing reflect the Veteran had some degree of hearing loss within his left ear at his separation from active service.

The Board, in the March 2015 remand, directed the AOJ to obtain an addendum medical opinion, which addressed the significance of this September 1970 in-service audiological examination. In a January 2016 medical opinion, a VA audiologist opined that the September 1970 examination, including the fluctuation in the Veteran's left ear hearing acuity at 500 hertz, was likely the result of testing error or a temporary medical condition. Specifically, the examiner explained that this increased in the Veteran's left ear hearing acuity, from 15 to 25 decibels at the frequency of 500 hertz, could be the result of a poor testing environment, placement of the headphones, or other such errors. The examiner additionally opined that this increase could represent a temporary medical condition, although the type of condition was not explained. 

Overall, the VA audiologist explained this temporary increase in the Veteran's left ear hearing acuity, from 15 to 25 decibels at the frequency of 500 hertz, was less likely than not an indication that the Veteran's current left ear hearing loss disability was incurred in or caused by the Veteran's active duty service. However, the Board finds this conclusion to be flawed in two key aspects. First, the examiner concludes that this September 1970 audiological examination does not show the Veteran to have a left ear hearing loss disability for VA purposes. This finding is in error, because, as explained above, the Court has held that the threshold for normal hearing is from 0 to 20 decibels. See Hensley, 5 Vet. App. at 157. As such, the Veteran's September 1970 examination, showing left ear hearing acuity of 25 decibels at 500 hertz, is an indication that he experienced some degree of left ear hearing loss during his active duty service. Therefore, the January 2016 VA audiologist's opinion that this was not suggestive of left ear hearing loss is given less weight. See Reonal v. Brown, 5 Vet. App. 458, 460-61 (1993) (an opinion based upon an inaccurate factual premise has no probative value).

Second, the Board finds the January 2016 VA audiologist's opinion to be internally inconsistent. Specifically, the examiner explains that this September 1970 audiological examination could be the result of testing error, or it could be the result of a temporary medical condition. Rather than resolving the benefit of the doubt in the Veteran's favor, the examiner concludes, without further explanation, that the September 1970 audiological examination was due to testing error, and that, therefore, the Veteran's current left ear hearing loss disability is not related to his active duty service. However, the Board finds this opinion to be conclusory and therefore not entitled to any significant probative value. 

The Board does, however, find the January 2016 VA audiological examiner's opinion regarding the etiology of the Veteran's right ear hearing loss disability to be probative as to the Veteran's left ear hearing loss disability. Specifically, the examiner concludes that the Veteran's sustained a "significant downward threshold shift" in the right ear hearing acuity at the frequency of 4000 hertz. The examiner noted that 4000 hertz frequency is known to be "noise- sensitive," and this downward shift was suggestive of a right ear hearing loss disability that was due to the Veteran's in-service noise exposure. 

In reviewing the Veteran's medical records, the Board finds the Veteran sustained a similar downward threshold shift in his left ear hearing acuity at the frequency of 4000 hertz. Specifically, reviewing the Veteran's December 2011 VA audiological examination, the Board observes the Veteran had a left ear hearing acuity of 50 decibels at 4000 hertz, compared to a right ear hearing acuity of 55 decibels at 4000 hertz. Furthermore, the January 2016 VA audiologist compared this December 2011 audiological examination to the Veteran's March 1973 separation examination as probative evidence of a right ear hearing loss disability resulting from in-service noise exposure. The March 1973 separation examination reported the Veteran's right ear hearing acuity at 4000 hertz was 5 decibels. Similarly, as noted above, the March 1973 separation examination reported the Veteran's left ear hearing acuity at 4000 hertz was 5 decibels. Therefore, based upon this similar shift in left ear hearing acuity at 4000 hertz, the Board finds the January 2016 VA audiologist's opinion as to the etiology of the right ear hearing loss disability, is probative with respect to the etiology left ear hearing loss disability. 

In light of the foregoing, and resolving all doubt in the Veteran's favor, the Board finds that service connection for a left ear hearing loss disability is warranted. In making this favorable determination for the Veteran, the Board has considered that evidence is rarely neat and tidy. Therefore, it is expected that the Board will at times have to construct a complete narrative by filling in gaps with inferences and common sense. There is no requirement that all factual questions be resolved by reliance on direct, rather than circumstantial, evidence. The fact finding of the Board in this case is entitled to deference and is not clearly erroneous. To the extent that the Board made inferences and considered circumstantial evidence in its analysis of the evidence, this type of reasoning is well within the discretion of a fact finder. Although another fact finder may have declined to make the same inference, that does not mean that the Board in the present case is clearly erroneous. Bastien v. Shinseki, 599 F.3d 1301, 1306 (Fed. Cir. 2010) ("The evaluation and weighing of evidence and the drawing of appropriate inferences from it are factual determinations committed to the discretion of the fact finder."). 

It is the defined and consistently applied policy of VA to administer the law under a broad interpretation, consistent, however, with the facts shown in every case. When, after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding service origin, the degree of disability, or any other point, such doubt will be resolved in favor of the claimant. 38 C.F.R. § 3.102. 

In conclusion, after resolving all doubt in the Veteran's favor, the Board finds the evidence supports a grant of service connection for a left ear hearing loss disability, as there is competent and credible evidence of both in-service noise exposure, and post-service left ear hearing loss disability for VA compensation purposes. See 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102. 

Governing Laws and Regulations for Entitlement to Increased Ratings:

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities ("Rating Schedule"), found in 38 C.F.R. § 4.1 (2016). The rating schedule is primarily a guide in the evaluation of disabilities resulting from all types of diseases and injuries encountered as a result of, or incident to, military service. Separate diagnostic codes identify the various disabilities and each disability must be viewed in relation to its history and the limitation of activity imposed by the disabling condition. The ratings are intended to compensate, as far as can practicably be determined, the average impairment of earning capacity resulting from such diseases and injuries and their residual conditions in civilian occupations. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.10. As such, each disability must be considered from the point of view of the veteran working or seeking work. 38 C.F.R. § 4.2.

In considering the severity of a disability, it is essential to trace the medical history of the Veteran. 38 C.F.R. §§ 4.1, 4.2, 4.41. Consideration of the whole-recorded history is necessary so that a rating may accurately reflect the elements of disability present. 38 C.F.R. § 4.2; Peyton v. Derwinski, 1 Vet. App. 282 (1991). Although the regulations do not give past medical reports precedence over current findings, the Board is to consider the Veteran's medical history in determining the applicability of a higher rating for the entire period in which the appeal has been pending. Powell v. West, 13 Vet. App. 31, 34 (1999).

Where, as here, the question for consideration is the propriety of the initial evaluation assigned, the relevant time period for consideration begins on the date that the claim for service connection was filed. Moore v. Nicholson, 21 Vet. App. 211, 216-17 (2007). In the instant appeal, that date is August 31, 2010.

Moreover, the Board acknowledges that a Veteran may experience multiple distinct degrees of disability that might result in different levels of compensation. Hart v. Mansfield, 21 Vet. App. 505, 509-10 (2007); Fenderson v. West, 12 Vet. App. 119, 126 (1999). The following analysis is therefore undertaken with consideration of the possibility that different ratings may be warranted for different time periods.

Pertinent regulations do not require that all cases show all findings specified by the Rating Schedule, but that findings sufficiently characteristic to identify the disease and the resulting disability and coordination of rating with impairment of function. 38 C.F.R. § 4.21. Therefore, the Board has considered the potential application of various other provisions of the regulations governing VA benefits, whether or not they were raised by the Veteran, as well as the entire history of his disability in reaching its decision. Schafrath v. Derwinski, 1 Vet. App. 589, 595 (1991). 

Where there is a question as to which of two disability evaluations shall be applied, the higher evaluation is to be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating is to be assigned. 38 C.F.R. § 4.7.

The Board notes that in analyzing this claim, the Secretary, and therefore the Board, has an obligation to provide the Veteran with the "benefit of the doubt" on questions material to this decisions, for which there is an approximate balance of positive and negative evidence. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; see also Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990).

When evaluating a service-connected mental disorder, the VA will review the Veteran's medical history to determine how badly the disorder has disrupted his social and occupational functioning. Specifically, the VA must review the frequency, severity, and duration of the psychiatric symptoms, the length of remissions, and the Veteran's capacity for adjustment during periods of remission. 38 C.F.R. § 4.126(a). The evaluation must be based on all the evidence of record that bears on occupational and social impairment rather than solely on the examiner's assessment of the level of disability at the moment of the examination. 38 C.F.R. § 4.126(a). While the extent of a Veteran's social impairment is considered, the rating cannot be assigned on these limitations alone. 38 C.F.R. § 4.126(b).

The level of disability is then rated according to a General Rating Formula for Mental Disorders, codified at 38 C.F.R. § 4.130 ("General Rating Formula"), which provides for ratings of zero, 10, 30, 50, 70, or 100 percent. The VA compensates Veterans beginning at 10 percent disability, and compensation increases at each level.

In the instant appeal, the AOJ granted service connection for PTSD and assigned disability ratings under Diagnostic Code 9411. Under this DC, a 10 percent evaluation is assigned for occupational and social impairment due to mild or transient symptoms, with decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or symptoms controlled by continuous medications. 38 C.F.R. § 4.130, Diagnostic Code 9411 (2016). 

A 30 percent evaluation is assigned for occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events). Id. 

A 50 percent evaluation is assigned for occupational and social impairment with reduced reliability and productivity due to such symptoms as flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short-and long-term memory; impaired judgment; impaired abstract thinking; disturbances of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships. Id.

A 70 percent evaluation is warranted where there is occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as suicidal ideation; obsessional rituals which interfere with routine activities; intermittently illogical, obscure, or irrelevant speech; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); and inability to establish and maintain effective relationships. Id.

A 100 percent evaluation is assignable where there is total occupational and social impairment, due to such symptoms as gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); and disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. Id.

Evaluation under this formula is "symptom driven," meaning that "symptomatology should be the fact-finder's primary focus when deciding entitlement to a given disability rating." Vazquez-Claudio v. Shinseki, 713 F.3d 112, 116-17 (Fed. Cir. 2013). In the context of determining whether a higher disability evaluation is warranted, the analysis requires considering "not only the presence of certain symptoms[,] but also that those symptoms have caused occupational and social impairment in most of the referenced areas" - i.e., "the regulation ... requires an ultimate factual conclusion as to the Veteran's level of impairment in 'most areas.'" Vazquez-Claudio, 713 F.3d at 117-18; 38 C.F.R. § 4.130, Diagnostic Code 9411. 
The Board notes that the Veteran need not exhibit "all, most, or even some" of the symptoms enumerated in the General Rating Formula for Mental Disorders to warrant the assignment of a higher rating. Mauerhan v. Principi, 16 Vet. App. 436, 442 (2002). The symptoms listed are not exhaustive, but rather "serve as examples of the type and degree of symptoms, or their effects, that would justify a particular rating." Id. In particular, use of such terminology permits consideration of items listed as well as other symptoms and contemplates the effect of those symptoms on the claimant's social and work situation. Id. 

Effective March 19, 2015, VA adopted as final, without change, an interim final rule amending the portion of its Schedule for Rating Disabilities dealing with mental disorders. The interim final rule replaced outdated references with references to the Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) and updated the nomenclature used to refer to certain mental disorders in accordance with DSM-5. Specifically, the rulemaking amended 38 C.F.R. §§ 3.384, 4.125, 4.126, 4.127, and 4.130. However, the provisions of this final rule do not apply to claims that were certified to the Board on or before August 4, 2014, even if such claims are subsequently remanded to the agency of original jurisdiction. As this appeal was certified to the Board in April 2013, the previous versions of the regulations including references to DSM-IV apply.

In addition to evidence regarding the Veteran's symptomatology and its impact on his social and occupational functioning, a Global Assessment of Functioning ("GAF") score is another component considered to determine the entire disability picture for the Veteran. The GAF score is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" from 0 to 100, with 100 representing superior functioning in a wide range of activities and no psychiatric symptoms. Carpenter v. Brown, 8 Vet. App. 240, 242 (1995) (quoting DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994)). 

Higher GAF scores denote increased overall functioning of the individual. For example, a GAF score of 51 to 60 represents "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks); or moderate difficulty in social, occupational, or school functioning, (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 46-47. Lower scores are indicative of greater symptoms and decreasing functionality of the individual. Specifically, a GAF score of 41 to 50 illustrates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting); or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id. 

While an examiner's classification of the level of psychiatric impairment at the moment of examination, by words or by a GAF score, is to be considered, it is not determinative of the percentage VA disability rating to be assigned; the percentage evaluation is to be based on all the evidence that bears on occupational and social impairment. See generally 38 C.F.R. § 4.126; VAOPGCPREC 10-95.

That being the relevant law to the Veteran's appeal, the Board observes the Veteran was initially assigned a 30 percent disability evaluation effective August 31, 2010. Thereafter, the AOJ assigned an increased evaluation of 70 percent, for the period beginning on and after January 12, 2016, the date of his most recent VA examination. 

ii. Entitlement to an increased evaluation, in excess of 30 percent, for the period prior to January 12, 2016: 

Following a thorough review of the Veteran's medical records, The Board finds the evidence of record is consistent with an initial 70 percent rating for the Veteran's PTSD, throughout the entire appeal period, effective from August 31, 2010. Beginning on and after August 31, 2010, the Veteran's service-connected PTSD is manifested by psychiatric symptoms more nearly approximating occupational and social impairment with deficiencies in most areas, which is required for a 70 percent rating. See 38 C.F.R. § 4.130. The Board has also considered additional, similar symptomatology not specifically addressed in the 70 percent criteria, but causing the appropriate level of occupational and social impairment for a 70 percent rating, under the General Rating Formula. Mauerhan, 16 Vet. App. at 442. In making this determination, the Board has reviewed both the medical and lay evidence of record: the Veteran's lay statements, arguments from his representative, and VA psychological examination dated in May 2011 and January 2016. 

In reaching this determination, the Board cannot discern any difference in the Veteran's overall psychiatric disability picture from the time beginning August 31, 2010 through January 12, 2016, the date on which the AOJ awarded an increased evaluation of 70 percent. VA treatment records and VA examinations essentially document that the Veteran's signs and symptoms have remained essentially unchanged since August 2010, thus providing evidence in support of an initial evaluation of 70 percent. Any minor fluctuations in the severity of his disability are episodic or temporary in nature. The Board is thus constrained to award a 70 percent evaluation from August 31, 2010. 

The medical and lay evidence of record document such signs and symptoms including social isolation, constant depression, anxiety, irritability, hypervigilance, increased startle responses, flashbacks, numbing, persistent nightmares three times per week or more, and insomnia. During various counseling appointments, the Veteran described difficulty interacting with co-workers and his tendency to isolate himself from others outside of his working relationships. For example, during this May 2011 examination, the Veteran reported that he becomes easily irritated with his co-workers and will "snap" at people approximately three to four times per week. The Veteran reported that one employee recently threatened to quit due to the Veteran's behavior towards him.

Additionally, during his May 2011 VA examination, the Veteran reported that he has "occasional" contacts with his family members, specifically his siblings and his father, and that he only has one close friend who lives near him. The Veteran admitted that he does not like to be around crowds, and for that reason he avoids going out or traveling to places. As an example, the Veteran stated his wife will travel out of town with her friends, and although the Veteran will be invited to join, he will decline the invitation so that he can stay home and avoid crowds and unfamiliar places. 

What limited social interactions the Veteran is able to maintain are focused around supportive groups for combat Veterans. For example, during the Veteran's May 2011 VA examination, he reported doing volunteer work with a combat Veterans' motor cycle association. A review of the Veteran's medical records shows he was enrolled in group therapy for PTSD combat Veterans at the Memphis VAMC. During these group therapy sessions, the clinician describes the Veteran's mood and behavior as depressed and anxious. The Veteran was reported to exhibit difficulty with getting to know others, and reported anxiety around crowd and unfamiliar places. 

In addition to the Veteran's decreased social functioning, the Board observes that he exhibited a high level of anxiety and hypervigilance. For example, the Veteran was noted to be "on guard" all the time and becomes easily irritated by situations and others. See e.g. May 2011 VA Examination. The Veteran reported that he is unable to attend public events, such as baseball games, due to the crowds and his concern that he would have "no way out" if something were to go wrong. The Veteran reported that he is additionally unable to shop in stores, as they are crowded and lead to an increase in the Veteran's anxiety. 

The Veteran's anxiety, intrusive thoughts, and hypervigilance additionally cause him to have impaired sleep. During the May 2011 VA examination, the Veteran reported that he is unable to sleep for more than 5 hours during a typical night, and will additionally wake up regularly throughout the night. A review of the Veteran's private medical treatment records similarly report he expresses difficulty sleeping, with approximately only 4 hours of sleep per night. See e.g. Memphis VAMC Records in VVA. During a July 2012 encounter, the Veteran reported an average of three to four nightmares per week. The Veteran additionally endorsed symptoms of obsessiveness and ritualistic behavior. See e.g. May 2011 VA Examination. He reported that he must check all the doors in his house three to four times per night, to make sure that they are locked. At work, the Veteran arranges items on his desk in a certain way every night before he leaves. 

Overall, the Board finds that the above described symptoms, are essentially the same as those described in the January 12, 2016 VA psychological examination. For example, during the January 2016 examination, the Veteran reported continued social isolation and an inability to be around crowds, loud noises, and unfamiliar locations. The Veteran endorsed regular flashbacks to events in service, and regular nightmares, both occurring on average approximately two to three times per week. The Veteran described avoidance behaviors, such as avoiding certain noises and movies which will trigger him to experience a flashback to his active duty service. 

Furthermore, the VA psychologist who administered the Veteran's January 2016 VA examination, observed that the Veteran's symptoms have remained generally constant since the time of his May 2011 VA examination. Based upon her review of the Veteran's medical records, the examiner concluded that the Veteran's symptoms have remained constant, and that his treating clinicians have made gradual increases in the Veteran's medication dosage levels, due to increased symptoms of depression and recurrent nightmares. The Veteran, himself, reported that his symptoms have remained fairly constant since the time of his May 2011 VA examination. 

Based upon this review of the record, the Board cannot discern any difference in the Veteran's overall psychiatric disability picture from the time period beginning August 30, 2010 through January 12, 2016, the time where the AOJ awarded a 70 percent rating for PTSD. The medical and lay evidence of record describe continuous symptoms which impaired the Veteran's ability to function socially and at work. Moreover, the Board finds the medical and lay evidence subsequent to the Veteran's May 2011 VA examination continue to reflect the Veteran's social and occupational impairments, consistent with an initial disability rating of 70 percent. 

In reaching this conclusion, the Board is aware of evidence within the record which suggests the Veteran's symptoms were consistent with an initial rating of 50 percent. Specifically, the Board is referring to the assignment of GAF score of 51, 55, and 60, which were assigned to the Veteran prior to his January 12, 2016 rating. See Memphis VAMC Records in VVA, Dated in August 2012, July 2012, and November 2012. These scores are indicative of "moderate" symptoms and limitations, which are more consistent with an initial disability rating of 50 percent. However, while these scores are probative evidence, they are not dispositive of the rating that should be assigned. 38 C.F.R. §§ 4.2, 4.6. 

Furthermore, a review of the objective observations from these two examinations reveals contrasting descriptions. For example, during the Veteran's February 2009 examination, the examiner reported the Veteran was visibly agitated, anxious, and guarded. Similarly, during a July 2012 examination, the Veteran was described as irritable, with a depressed mood, increased startle responses, numbness towards others, and socially withdrawn. Despite these observations, the Veteran was assigned a GAF of 60. However, the Board finds these observations suggest the Veteran's symptoms imposed greater imitations than the "moderate" GAF scores reflect. As such, the Board places greater weight on the objective descriptions of the Veteran, as opposed to the GAF scores, as these observations are more consistent with a 70 percent disability rating. 

 ii. Entitlement to an increased evaluation, in excess of 70 percent: 

However, while totality of the evidence shows the Veteran's symptoms are consistent with a 70 percent disability rating throughout the entire appeal period, the Board finds no credible evidence which would suggest the Veteran's symptoms meet the criteria for a higher evaluation. The medical and lay evidence beginning on and after August 31, 2010, are not indicative of someone with psychiatric symptomatology causing total occupational and social impairment, which is required for the 100 percent rating. 38 C.F.R. § 4.130. Specifically, there is no evidence which documents a gross impairment in thought process or communication; there is no evidence of any delusions or hallucinations; no grossly inappropriate behavior; no "persistent" danger of hurting himself; no disorientation to time or place; and no memory loss for names of close relatives, own occupation, or own name. Id. 

General observations of the Veteran throughout the period on appeal do not suggest he ever struggled to maintain or neglected his personal hygiene. Rather, he was consistently observed to be appropriately dressed and "neatly groomed." For example, during an appointment in August 2010, the Veteran was described as "neat, friendly, and oriented." See Memphis VAMC Records. During the Veteran's May 2011 VA examination, he was described as "clean and appropriately dressed." Similarly, during the January 2016 VA examination, the Veteran was described as casually dressed with fair grooming and good hygiene. Furthermore, throughout the period on appeal, the Veteran was able to independently care for himself and his personal hygiene. 

Additionally, the Veteran's group therapy treatment notes do not reflect any gross impairments of thoughts or significant social limitations. During all encounters, the Veteran was described as oriented with "logical" thought processes, showing no evidence of impaired judgement or thinking, or auditory/visual hallucinations. See Memphis VAMC Records. The Veteran was further observed to consistently be alert and oriented to person, place, and time. These group therapy session summaries document that the Veteran was able to interact with others in a group setting, communicate his ideas and experiences to others, and was consistently reported as engaged during group therapy appointments. These summaries further indicate the Veteran was able to provide insight to other members, by identifying the methods he has used and found the most helpful at controlling his PTSD symptoms. 

More recent psychological examinations report the Veteran continues to be capable of engaging in social contact with others, both within a social and occupational setting. For example, during the Veteran's January 2016 VA examination, he was observed to make appropriate eye contact. His through process was reported as coherent and logical, and the examiner remarked the Veteran's judgment and insight were intact. During this examination, the Veteran reported that he continued to be involved with a combat Veterans' motorcycle association that does volunteer work. The Veteran has been married to his wife for 45 years, and is able to interact with her and their children. 

From an occupational standpoint, the Board finds no evidence which suggests the Veteran's symptoms result in a total impairment. During the January 2016 VA examination, the Veteran reported that he continues to work for the same employer, and continues to be employed within a supervisory role. This finding is significant, because it shows the Veteran is capable of interacting with others on a sustained basis. Although the Board acknowledges the Veteran experiences deficits within his social functioning, as described above and as reflected in the assignment of a 70 percent evaluation, his ability to supervise others is suggestive that he does not experience total social impairment. 

During both the May 2011 and January 2016 VA examinations, the Veteran denied that his PTSD symptoms have caused him to take any time off work, or have caused him to miss any period of work. Thus, while the Board acknowledges that the Veteran experiences daily symptoms and limitations as a result of his PTSD, the evidence does not suggest that the totality of his symptoms did not preclude him from interacting well with others on a regular and sustained basis. 

Similarly, while the Veteran endorses avoidance of certain activities and locations, the overall evidence does not suggest his PTSD precludes him from performing regular daily activities and chores. For example, the Veteran reported his avoids shopping in-stores due to his anxiety and fear of crowds. However, the Veteran remains able to travel to work, and work around others. He continues to remain engaged in volunteer work, and has reported no limitations in his ability to complete daily tasks and chores around the house. 

Most significantly, the overall medical record does not show any periods of in-patient psychiatric hospitalizations or loss of functioning. Rather, the Veteran is treated on an out-patient basis, and is involved in group therapy. The totality of these group and individual therapy reports show the Veteran continued to experience social limitations due to his anxiety, hyperarousal, and mood liability. However, despite these limitations, the totality of the evidence is not suggestive of total social impairment. In sum, the Board finds no medical or lay evidence which shows the Veteran's symptoms resulted in total social or occupational impairment.

Accordingly, the Board finds that the evidence supports an initial disability rating of 70 percent, but no higher, for the service-connected PTSD throughout the entire appeal period. 38 C.F.R. § 4.3. It is not necessary to "stage" the Veteran's ratings any further than discussed above, as the Veteran's PTSD symptoms have been consistent at the 70 percent levels for the respective time period delineated by the Board in the present decision. Fenderson, 12 Vet. App. at 126. Therefore, from August 31, 2010 to the present, the Board concludes the evidence supports an initial 70 percent rating, but no higher, for the Veteran's service-connected PTSD. 38 C.F.R. § 4.3. 

The Board has also contemplated whether the case should be referred for extra-schedular consideration. An extra-schedular disability rating is warranted if the case presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization that application of the regular schedular standards would be impracticable. 38 C.F.R. § 3.321(b)(1). 

The determination of whether a claimant is entitled to an extra-schedular rating under 3.321 is a three-step inquiry. First, it must be determined whether the evidence presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. If the criteria reasonably describe the claimant's disability level and symptomatology, then the claimant's disability picture is contemplated by the rating schedule, the assigned schedular evaluation is, therefore, adequate, and no referral is required. Thun v. Peake, 22 Vet. App. 111, 115-16 (2008),

Second, if the schedular evaluation does not contemplate the claimant's level of disability and symptomatology and is found inadequate, the Board must determine whether the claimant's exceptional disability picture exhibits other related factors such as "marked interference with employment" and "frequent periods of hospitalization." Third, when an analysis of the first two steps reveals that the rating schedule is inadequate to evaluate a claimant's disability picture and that picture has attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service to determine whether, to accord justice, the claimant's disability picture requires the assignment of an extra-schedular rating. Id. 

The Federal Circuit provided guidance in rating psychiatric disabilities, emphasizing that the list of symptoms under a given rating is nonexhaustive. Vazquez-Claudio, supra. The psychiatric symptoms present in this case are either listed in the schedular criteria or are similar in kind to those listed, as discussed above. Review of the record does not reveal that the Veteran suffers from any symptoms of PTSD that are not contemplated in the nonexhaustive list of symptoms found in the schedular criteria. Furthermore, the rating schedule provides for greater compensation for greater disability than that suffered by the Veteran. Therefore, the Board finds that the rating criteria reasonably describe the Veteran's disability level and symptomatology of his service-connected PTSD. As such, the Board finds that the rating schedule is adequate to evaluate the Veteran's disability picture. 

The Board notes that, pursuant to Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014), a Veteran may be awarded an extra-schedular rating based upon the combined effect of multiple conditions in an exceptional circumstance where evaluation of the individual conditions fails to capture all the symptoms associated with service-connected disabilities experienced. However, in this case, as the decision does not involve evaluation of multiple service-connected disabilities, further discussion of Johnson is not necessary. 

Accordingly, the Board need not proceed to consider the second factor, viz., whether there are attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization. Consequently, the Board concludes that referral of this case for consideration of an extra-schedular rating is not warranted. Id.; Bagwell v. Brown, 9 Vet. App. 337, 338-39 (1996); Floyd v. Brown, 9 Vet. App. 88, 96 (1996).

In light of the foregoing evidence, the Board finds that the Veteran's social and occupational limitations are best approximated by the criteria for a 70 percent evaluation under the rating formula, and so the Veteran's claim for an increased initial rating, in excess of 70 percent, for his PTSD is not warranted. 






(CONTINUED ON NEXT PAGE)

ORDER

Subject to the laws and regulations governing the award of monetary benefits, entitlement to a left ear hearing loss disability is granted. 

Subject to the laws and regulations governing the award of monetary benefits, entitlement to an increased evaluation of 70 percent for the service-connected PTSD is granted beginning on and after August 31, 2010. 

Entitlement to an evaluation, in excess of 70 percent, is denied. 






______________________________________________
DAVID L. WIGHT
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs